**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| CONTINENTAL CASUALTY COMPANY,<br>Plaintiff,<br><br>vs.<br><br>STUART H. SOJCHER, ESQ., et al.<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 07-CV-11598 RGS |

**PLAINTIFF CONTINENTAL CASUALTY COMPANY'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff Continental Casualty Company ("Continental") submits this Statement of Material Facts in Support of its Motion for Summary Judgment.

**Introduction**

1. Continental issued Lawyers' Professional Liability Policy No. LAW-268022438 to Defendant Stuart H. Sojcher ("Sojcher") for the August 1, 2005 to August 1, 2006 policy period (the "Policy"). *See* Policy, a true and correct copy which, without the application, is attached hereto as Ex. A; Declaration of Lucy Aiello ("Aiello Decl."), filed concurrently with Continental's Motion for Summary Judgment, at ¶ 2.

2. Defendants Chestnut Hill Private Mortgage Co., Inc. f/k/a Chestnut Hill Mortgage & Realty, Inc. and SD Corporation are private lending entities principally controlled by Stuart Levey, and are referred to herein collectively as "Chestnut Hill." *See* Defendant Chestnut Hill Private Mortgage Co., Inc. f/k/a Chestnut Hill Mortgage & Realty, Inc. and SD Corporation's Answers to Plaintiff Continental Casualty Company's First Interrogatories at 2.

("Chestnut Hill's Interrogatory Responses"), a true and correct copy of which is attached hereto as Exhibit B.

3. Defendant First American Title Insurance Company ("First American") is a title insurance company to which several title-related claims, arising out of transactions closed by and/or involving Sojcher, have been reported. *See* Verified Complaint and Request for Injunctive Relief, served in the action styled *First American Title Insurance Co. v. Sojcher*, Case No. 06-4284, in the Superior Court for Suffolk County, Massachusetts (the "First American Complaint"), a true and correct copy of which (without exhibits) is attached hereto as Ex. C.

4. Chestnut Hill and First American have made claims against Sojcher, for which coverage has been sought under the Policy. *See id.* and Complaint and Demand for Jury Trial, served in the action styled *Chestnut Hill Private Mortgage Co., Inc. f/k/a Chestnut Hill Mortgage & Realty, Inc. v. Sojcher*, Case No. 06-04825, in the Superior Court for Suffolk County, Massachusetts (the "Chestnut Hill Complaint.") A true and correct copy of the Chestnut Hill Complaint (without exhibits) is attached hereto as Ex. D.

**<u>The Policy and the Application</u>**

5. The Insuring Agreement of the Policy provides as follows:

> I. INSURING AGREEMENT
>
> A. Coverage
>
> The **Company** agrees to pay on behalf of the **Insured** all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the **policy period** by reason of an act or omission in the performance of **legal services** by the **Insured** or by any person for whom the **Insured** is legally liable, provided that:
>
> 1. the **Insured** did not give notice to a **prior insurer** of such **claim** or a **related claim**;

> 2. the **Insured** did not give notice to a **prior insurer** of any such act or omission or **related act or omission**;
> 3. there is no other policy, whether primary, contributory, excess, contingent or otherwise, which provides insurance to any **Insured** for the **claim** based on or arising out of an act or omission in the performance of **legal services** by such **Insured** or by any person for whom the **Insured** is legally liable while affiliated with a firm other than the **Named Insured**.
>
> B. Defense
>
> The **Company** shall have the right and duty to defend in the **Insured's** name and on the **Insured's** behalf a **claim** covered by this Policy even if any of the allegations of the **claim** are groundless, false or fraudulent. The **Company** shall have the right to appoint counsel and to make such investigation and defense of a **claim** as is deemed necessary by the **Company**. If a **claim** shall be subject to arbitration or mediation, the **Company** shall be entitled to exercise all of the **Insured's** rights in the choice of arbitrators or mediators and in the conduct of an arbitration or mediation proceeding.
>
> If the **Company** agrees to defend a **claim** but reserves its rights to deny coverage on grounds which create a conflict of interest between an **Insured** and the **Company**, and the **Insured** does not waive the conflict then the **Insured** may select independent counsel. Such counsel shall have at least five (5) years of experience in the defense of similar claims, and have in place error and omissions insurance. The **Insured** and independent counsel shall provide full information, documentation and cooperation with respect to the defense, investigation, and settlement of any **Claim**. The **Company** shall be liable only for reasonable and necessary **claim expenses** at rates customarily paid by the **Company** for the defense of similar **claims** in the area where the **claim** is being defended.

*Id.* at §§ I.A. and B. Words in bold are defined terms in the Policy.

6. Section V.L. of the Policy, entitled "Entire Contract", provides, in relevant part:

   By acceptance of this Policy, the **Insured** agrees that:

> 1. all of the information and statements provided to the **Company** by the **Insured** are true, accurate and complete and shall be deemed to constitute material representations made by all the **Insureds**;
>
> 2. this Policy is issued in reliance upon the **Insured's** representations; and
>
> 3. this Policy, endorsements thereto, together with the completed and signed application and any and all supplementary information and statements provided by the **Insured** to the **Company** (all of which are deemed to be incorporated herein) embody all of the agreements existing between the **Insured** and the **Company** and shall constitute the entire contract between the **Insured** and the **Company**.
>
> No oral or written misrepresentations made in the negotiation of this Policy of insurance by the **Insured** or in his or her behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation is made with actual intent to deceive, or unless the matter misrepresented increased the risk of loss. Notwithstanding the foregoing, this policy will be null and void only with respect to those **Insureds** who participate in, or who have knowledge of, or who should have knowledge of, the misrepresentation of any material matter in the negotiation of this Policy or application.

*Id.*, § V.L. (italic emphasis added).

7. In order to obtain the Policy, Sojcher submitted to Continental his "Renewal Application for MBA Lawyers Professional Liability Insurance Claims Made Basis" (the "Application"). A true and correct copy of the Application, which Sojcher signed on June 7, 2005, is attached hereto as Ex. E; *see also* Aiello Decl. at ¶ 4.

8. Question 3(a) of the Application asks:

> Is the firm, or any attorney affiliated with the firm, aware of any acts, omissions or circumstances which a reasonable person would expect may give rise to a professional liability claim in the future against the firm, any predecessor firm, or any current or former attorney of the firm while affiliated with the firm, which has not been reported to CNA?

After Question 3, the Application notes, in bold:

> If yes, a) Notify CNA Insurance Companies via fax #212-440-7050 Attn: Regional Director, GSL Lawyers Claims, 40 Wall Street, 9th Floor, New York, NY, 10005, in writing and b) attach a copy of the letter to this application and c) complete the attached claim supplement.

*Id.*

9. Sojcher checked the box next to "No" in response to Question 3(a), and never changed or supplemented that answer. *See id.;* Aiello Decl. at ¶ 7.

10. Sojcher signed the Application below the Application's warranty language, which provided:

> Applicant further warrants [that] . . . neither applicant nor any of its partners, directors, associates, managers, members or employees are aware of any act or omission or related acts or omissions in the rendering of legal services which a reasonable person would view as likely to give rise to a claim in the future.
>
> * * *
>
> Further, Applicant and each and every partner, officer, director, associate, manager, member and employee understand and acknowledge that:
>
> 1. If a policy is issued, the Company will have relied upon as representations: the application and any supplemental applications, and any other statements furnished to the Company in conjunction with this application, all of which are hereby incorporated by reference into the application and made a part hereof;
>
> 2. This application will be the basis of the contract and will be incorporated by reference into and made part of such policy; and
>
> 3. Applicant's failure to report to its insurance company during the policy term any claim made against it . . . and any act, omission, or circumstance which may give rise to a claim in the future against it or any of its partners, officers, directors, associates, managers, members or employees may create a lack of coverage.

*Id.* at 2.

**The First American and Chestnut Hill Lawsuits**

11. In 2006, First American and Chestnut Hill filed lawsuits against Sojcher, for which coverage is sought under the Policy. *See generally* Exs. C and D, First American and Chestnut Hill Complaints. Both First American and Chestnut Hill have alleged that Sojcher mishandled real estate transactions in many ways, including by failing to pay off prior liens of record on certain property. *See generally id.* In general, these properties were transferred and refinanced several times during the relevant period and were used as collateral to secure both conventional and private loans. *See generally id.*

12. First American asserts in its Complaint that, in connection with nine real estate transactions closed during the 2003 to 2006 time period, Sojcher: (i) failed to remit title policies and premiums to First American; (ii) issued title polices on condominiums after expiration of phasing rights adversely affecting title; (iii) failed to obtain necessary mortgage discharges and releases on mortgaged properties; and (iv) failed to properly pay off existing liens, as required by the First American title policies that Sojcher issued. *See generally* Ex. C, First American Complaint.

13. First American asserts the following causes of action against Sojcher: (i) breach of contract; (ii) failure to pay amounts due under a promissory note; (iii) gross negligence; and (iv) injunctive relief. *See id.* at

14. According to the Chestnut Hill's Complaint, in the 2003 to 2006 time period, Sojcher introduced Chestnut Hill's principal, Stuart Levey ("Levey"), and Levey's affiliate companies to lending opportunities, issued title insurance policies in connection with the resulting transactions, and then closed the loans on behalf of Levey's affiliates. *See generally* Ex. D, Chestnut Hill Complaint.

15. Chestnut Hill alleges that, in connection with four separate loan transactions, Sojcher's negligence caused Levey's affiliate company damages, including by: (i) failing to ensure that the stated collateral was what Sojcher represented it to be; (ii) failing to obtain and deliver title policies paid for at closing; (iii) failing to obtain payoff letters and discharges of senior mortgages; (iv) failing to provide and record loan documentation that reflected the existence of the loans; (v) failing to advise plaintiffs of legal risks associated with cross-collateralizing loans with non-borrowers; and (vi) improperly serving as counsel for the borrowers in the same transactions in which he represented Chestnut Hill as the lender, without first obtaining the lender's consent to the simultaneous representation, to Chestnut Hill's disadvantage. *See id*. at ¶ 33.

16. Chestnut Hill has alleged that Sojcher has committed negligence, breached the duty of loyalty by simultaneously representing borrowers and lenders, and committed unfair or deceptive trade practices within the meaning of M.G.L. c. 93A. *See id*. at ¶ 55.

**Stuart Sojcher**

17. Sojcher was disbarred from the practice of law on June 28, 2007, for the commingling and conversion of real estate sale proceeds for his own use, and for the failure to pay off and discharge outstanding obligations in real estate transactions. *See* Judgment of Disbarment entered on June 28, 2007 in the action styled *In re Stuart H. Sojcher*, No. BD-2006-045, in the Supreme Judicial Court for Suffolk County, Massachusetts (the "Disbarment Judgment"). A true and correct copy of the Disbarment Judgment is attached hereto as Ex. F.

18. In the Disbarment Judgment, among other things, the Massachusetts Supreme Judicial Court noted that Sojcher's "failure to promptly pay [prior, senior] liens and mortgages and to secure the necessary discharges violated Mass. R. Prof. C. 1.2(a) (lawyer shall seek the

lawful objectives of his client) and 1.15(c) (a lawyer must promptly turn over funds to the persons entitled to receive them)." *Id.*

19. Sojcher has invoked his Fifth Amendment privilege against self-incrimination ("Fifth Amendment Privilege") in response to all of Continental's discovery requests in this case. *See* Defendant Stuart H. Sojcher's Response to Plaintiff Continental Casualty Company's First Set of Requests for Admission, a true and correct copy of which is attached hereto as Ex. G; Defendant Stuart H. Sojcher's Answers to Plaintiff Continental Casualty Company's First Interrogatories, a true and correct copy of which is attached hereto as Ex. H; Response to Continental Casualty Company's First Requests for Production of Documents to Defendant Stuart H. Sojcher, a true and correct copy of which is attached hereto as Ex. I. However, as detailed below, Sojcher has given deposition testimony in connection with at least three other cases involving some of the transactions and events at issue here. In those depositions, Sojcher has testified about both the general types of transactions in which he was involved and the specifics of certain transactions.

20. Prior to his suspension and disbarment, Sojcher was an attorney in Massachusetts, whose practice focused on real estate law. *See* Deposition of Stuart Hartley Sojcher, taken on May 22, 2006, in connection with the action styled *Coyne v. Smith*, Civil Action No. 05-0917A, in the Plymouth County, Massachusetts Superior Court ("Sojcher's Depo. in Coyne"), a true and correct copy of which is attached hereto as Exhibit J, at 6. Until May 16, 2006, when First American suspended Sojcher's agency contract, Sojcher was a title issuing agent for First American. Defendant First American Title Insurance Company's Answers to Plaintiff's Interrogatories, served on October 8, 2008, a true and correct copy of which is attached hereto as Ex. K, at 10-11. As part of his real estate practice, Sojcher prepared loan documentation and

conducted closings. *See, e.g.*, Deposition of Stuart H. Sojcher, taken on February 8, 2008, in the lawsuit styled *In re Kerri M. Dowd*, Case No. 07-13849-WCH, in the United States Bankruptcy Court for the Eastern District of Massachusetts (the "Sojcher's Depo. in Dowd"), a true and correct copy of which is attached hereto as Ex. L at 18.

21. In describing under oath his behavior in the transactions at issue in the First American and Chestnut Hill Complaints, Sojcher alternately has blamed others, joked about writing a tell-all book, hinted at suicide, and asserted his Fifth Amendment Privilege. *See id.* at 73, 106; Deposition of Stuart H. Sojcher, taken on September 20, 2007 in the lawsuit styled *In re Shamus Holdings, LLC*, in the United States Bankruptcy Court for the District of Massachusetts (the "Sojcher's Depo. in Shamus"), a true and correct copy of which is attached hereto as Ex. M, at 28-29; *see also* Exs. G-I, Sojcher's Admissions, Interrogatory Responses, and Responses to Requests for Production.

22. In addition to the First American and Chestnut Hill Lawsuits, since June 7, 2005, at least six other lawsuits have been filed against Sojcher. *See, e.g., Hayon v. Sojcher,* Superior Court No. 05-4035, in the Superior Court of Suffolk County, Massachusetts Superior Court (alleging that Sojcher was served with a Trustee Summons but failed to make arrangements to pay off certain debt and allegedly transferred his personal property in order to hinder or defraud creditors); *Coyne v. Smith*, Civil Action No 05-0917A, in the Superior Court for Plymouth County, Massachusetts (the "Coyne Lawsuit") (alleging that Sojcher committed malpractice by failing to protect a trust and notarizing a forged signature); *JLD Realty Trust v. Sojcher,* Civil Action No. 07-2214A, in the Superior Court of Suffolk County, Massachusetts (alleging that Sojcher committed fraud and conversion by preparing the "JLD Realty Trust," but then, without authorization appointed himself trustee, and encumbering the trust property with two mortgages);

*Option One Mortgage Corp. v. Premium Capital Funding, LLC,* Civil Action No. 07-3482, in the United States District Court for the Eastern District of New York (the "Option One Lawsuit") (alleging that Sojcher and others engaged in loan fraud, converted loan funds, and failed to pay off and obtain discharge of a senior lien); *Link Development, LLC v. Sojcher,* Civil Action No. 06-5242, in the Superior Court for Suffolk County, Massachusetts (alleging that Sojcher negligently set up a limited liability company, filed fraudulent documents with the secretary of state, and secured loans against the plaintiff LLC without authorization from its principals); and *Akikie v. Laverty*, Civil Action No. 05-5244G, in the Superior Court for Suffolk County, Massachusetts (alleging that Sojcher, as an escrow agent, and Bernard Laverty, his client and the prospective buyer, breached a real estate sales contract and committed fraud and unfair and deceptive trade practices). True and correct copies of pleadings in these six lawsuits, without exhibits, are attached hereto as Group Ex. N.

23. Just last month, another lawsuit was filed, *Fidelity National Title Insurance Co. v. Sojcher*, Case No. 08-3743, in the Superior Court of Suffolk County, Massachusetts (the "Fidelity Lawsuit"), alleging that Sojcher's actions exposed title insurer Fidelity to well over $512,000 in liability – and Sojcher was not even a Fidelity agent. *See* Complaint in Fidelity Lawsuit, a true and correct copy of which is attached hereto as Ex. O.

**Other Individuals And Entities Involved in the Transactions**

24. Sojcher has characterized the others involved with him in the transactions at issue in the First American and Chestnut Hill Complaints (the "Transactions") as follows: "[W]ell, I'm a disbarred attorney who did terrible things and so on and so forth; but look at the people who I was involved with. Really nice people. Vermin and scum of the earth." Ex. L, Sojcher's Depo. in Dowd, at 73.

**<u>Frank Fraine And His Straw Companies</u>**

25. Sojcher and Laverty have testified that Frank Fraine was "the puppeteer" behind the Transactions, and was the true owner and manager of several of the business entities referred in the Complaints, including but not limited to: 655 Corporation, 320 Corporation, On Broadway Corporation, Foundry Realty, LLC, Platinum Investments, FKB Main, KBF Sales, SOS Realty LLC, City-Scapes Limited Partnership, Kristen Corporation, and Main Street Brewery. *See* Ex. M, Sojcher's Depo. in Shamus, at 19-20; 28-29; 32-34 and Deposition of Bernard J. Laverty, Jr., taken on September 21, 2007, in the lawsuit styled *In re Shamus Holdings, Inc.*, Case No. 07-14572, in the United States Bankruptcy Court for the District of Massachusetts (the "Laverty Depo."), a true and correct copy of which is attached hereto as Ex. P, at 11-15, 19.

26. Fraine, a convicted felon with reported ties to organized crime, ran his business out of an operation called the "Foundry." Ex. M, Sojcher's Depo. in Shamus at 28-29; Maggie Mulvihill and Jack Meyers, *AG Declines to Prosecute Fraine over Disability Flap*, THE BOSTON HERALD, Jan. 25, 2002, at 025, a true and correct copy of which is attached hereto as Exhibit Q. Sojcher acted as manager of Foundry Realty, LLC. *See* Ex. M, Sojcher's Depo. in Shamus at 30; Ex. P, Laverty Depo. at 13. Sojcher has testified that the individuals associated with Fraine and the Foundry were a "den of thieves." Ex. M, Sojcher's Depo. in Shamus at 29. Although Fraine "could have not used his name . . . with respect to the real estate empire that he was trying to build . . . he basically called the shots." *Id.* at 28. Sojcher testified that Fraine had others acting as "straws." *Id.* at 33, 37.

**<u>Bernard J. Laverty</u>**

27. Bernard J. Laverty, Jr. is a former partner of Fraine, who participated in several of the transactions at issue, either in his individual capacity or as a trustee or officer of a borrower

entity. *See, e.g,* March 12, 2004 Mortgage and Security Agreement ("Mortgage") from LBM Financial, LLC, a true and correct copy of which is attached hereto as Ex. R. In connection with the above-referenced Mortgage, Laverty signed on behalf of SOS Realty LLC, (as Manager), "City-Scapes" Limited Partnership (in an undisclosed capacity), The Geneva, LLC (as Manager), and On Broadway Corporation (as President and Treasurer). *See id.*

28. According to Sojcher, "Laverty has been known in the past to sign other people's names. He has defrauded many people . . . ." Ex. L, Sojcher's Depo. in Dowd at 65-66. Sojcher has been aware since 2002 that Laverty has forged the signatures of others. Sojcher's Depo. in Dowd at 66-68. Sojcher testified that he saw Laverty forge the signatures of others – Laverty's wife, Frank Fraine – on "[a] number of occasions," including on a loan application completed for a transaction in which Sojcher acted as the closing attorney. *Id.* at 67-68.

29. Sojcher has called Laverty "scum" and remarked: "There is a clear pattern of his lies and deception for several years." Sojcher's January 11, 2008 e-mail to Levey, a true and correct copy of which is attached hereto as Ex. S.

**<u>Georgette Clements</u>**

30. Georgette Clements is Fraine's daughter-in-law, who Fraine often asked to conduct business for him. *See* Affidavit of Francis Fraine, a true and correct copy of which is attached hereto as Ex. T.

31. In connection with the bankruptcy proceedings for BLJ Realty, LLC, Clements admitted that she has no experience in developing real estate and that all of the actions that she took on behalf of BLJ Realty, LLC were at Fraine's instruction. *See* Motion for Relief from the Automatic Stay and for Leave to Foreclose Mortgage, in the lawsuit styled *In re BLJ Realty, LLC*, Case No. 06-13415-JNF, in the U.S. Bankruptcy Court for the District of Massachusetts, a true and correct copy of which is attached hereto as Ex. U, at 2.

**Stuart Levey And His Companies**

32. Sojcher represented Stuart Levey and his lender companies, including Chestnut Hill and SD Corp., in over thirty loan transactions. Ex. B, Chestnut Hill's Interrogatory Responses at 3. Chestnut Hill is a "hard money" lender, rather than a traditional commercial lender, and often offered short-term loans at high interest rates. Ex. L, Sojcher's Depo. in Dowd at 25. Chestnut Hill's principal, Levey, would only make certain loans if residential property used as collateral was transferred to a trust, otherwise the unfavorable loan terms he offered would not comply with Massachusetts usury regulations. *Id.* at 29-30.

**LBM Financial, LLC**

33. LBM is a private mortgage company purportedly run by Marcello M. Mallegni ("Mallegni"). Ex. M, Sojcher Depo. in Shamus at 38-39. Sojcher testified that LBM's representatives, including Mallegni and LBM attorney, Michael J. Norris, are "liars." *Id*. at 65. Sojcher testified that LBM operated outside of the general framework for lenders, stating that, as a "general practice," LBM did not sign documents and did not give discharges. *Id.* at 66-68.

**Before Sojcher Signed the Application, He Participated in a Sham Transaction Designed to Induce a Federally-Insured Lender To Make a Multi-Million Dollar Loan**

34. Sojcher has admitted that, prior to June 7, 2005, the date on which he signed the Application, he participated in a sham transaction designed to induce a federally-insured lender to make a multi-million dollar loan.

35. Specifically, 655 Corporation, one of Fraine's "straw" companies, was created to develop condominium units at 655 West Second Street, in South Boston. *Id.* at 32-33; 37-38. General Bank was willing to lend $5.6 million to 655 Corporation, but only if 655 Corporation first arranged for $1.2 million in capital to be infused into the company to pay down a pre-existing debt that would have a superior interest in the collateral to General Bank. *Id.* at 51, 55-

56; Ex. P, Laverty Depo. at 17-18; 23-25. In order to create the illusion that this condition had been satisfied, the parties seeking the loan from General Bank documented a transaction whereby LBM purportedly loaned $1.2 million to 655 Corporation, which used the loan proceeds to pay down the pre-existing debt. Ex. M, Sojcher's Depo. in Shamus at 44-49; Ex. P, Laverty Depo. at 19; 28-33. In fact, however, and contrary to the deal documentation submitted to General Bank, LBM never paid the $1.2 million to 655 Corporation. Ex. M, Sojcher Depo. in Shamus at 49-50; 52; 55-57; Ex. P, Laverty Depo. at 18-19, 28-29, 41-42.

36. Sojcher not only performed the title search in connection with this fraudulent transaction, but also signed a "Guaranty" as Manager of Foundry Realty, LLC, another one of Fraine's straw companies, in partial security on the purported loan from LBM to 655 Corp. Ex. M, Sojcher Depo. in Shamus at 44-49; 55; Ex. P, Laverty Depo. at 22. A true and correct copy of the Guaranty that Sojcher signed as a manager of Foundry Realty, LLC is attached hereto as Ex. V.

37. Sojcher expressly has acknowledged under oath that the loan for LBM to 655 Corp. was a "sham." Ex. M, Sojcher Depo. in Shamus at 58; *see also* Ex. P, Laverty Depo. at 19. He testified to the mechanics of the scam: "the LBM to 655 Corporation or the alleged loan was purportedly set up and documented to induce General Bank to lend money to 655 Corporation." Ex. M, Sojcher Depo. in Shamus, at 56. He further testified: "I mean, if you look at it, it looks like a purchase[] money mortgage, but it wasn't a purchase[] money mortgage. But no money changed hands. The[] only money that changed hands was the money that LBM used to record documents." *Id*. at 52.

38. Laverty, who signed as Manager of 655 Corp. in connection with the transaction, has confirmed that the LBM to 655 Corp. loan was a sham designed to deceive General Bank. Ex. P, Laverty Depo. at 18-19. He testified:

> Q: And you were involved in the discussions, were you not, where 655 Corp. was going to advise General Bank that they had satisfied General Bank's underwriting standards by infusing $1.2 million and paying down the [prior] debt?
> A: Correct.
> Q: But that wasn't true, was it?
> A: No . . .

*Id.* at 31-32.

> Q: So there was no money paid anyway?
> A: None.
> Q: So that transaction was a sham, if you will, created only to attempt to illustrate equity in the property so the General Bank would make the loan?
> A: Absolutely.

*Id.* at 19.

Also in connection with the 655 Corporation-General Bank transaction, Sojcher was required to discharge two prior liens held by New England Phoenix Co., Inc. On or around January 27, 2006, a Discharge of Mortgage and Security Agreement and Partial Release of Mortgage and Security Agreement dated February 11, 2002 were filed with the Suffolk, Massachusetts Division of the Land Court (the "Discharge"). Ex. C, First American Complaint, at ¶ 14. Deposition of Eugene Gurvits, taken on March 26, 2008, in the lawsuit styled *Litton Loan Servicing, L.P. v. First American Title Insurance Co.*, Civ. Action No. 1-07-cv-12330-rwz ("Gurvitis Depo."), a true and correct copy of which is attached hereto as Exhibit W, at 51.

39. The validity of the Discharge has been challenged, and First American's representative has testified that First American suspects that Sojcher created and filed the fraudulent Discharge. Gurvits Depo. at 51. Eugene Gurvits of First American testified about this transaction in a deposition on March 26, 2008 stating:

A: The parties in the [655 Transaction] understood that there was an indebtedness. It is my understanding that there was on the record a discharge of the obligation; which is the subject of the claim, and the discharge was placed there by Stuart Sojcher.
Q: So, it's a fraudulent discharge?
A: So the discharge, yeah, we believe it was placed there fraudulently.

*Id.* at 51.

40. Although Sojcher has not admitted to creating the fraudulent Discharge, he did admit under oath in his February 8, 2008 deposition in the *Dowd* case:

Q: Have you created fraudulent documents?
A: It is possible I did in the past, yes.

Ex. L, Sojcher's Depo. in Dowd at 78.

**Before Sojcher Signed the Application, He Notarized Signatures Outside of the Signatories' Physical Presence, Including Signatures He Knew To Be Forgeries**

41. Sojcher has testified under oath that, prior to June 7, 2005, the date on which he signed the Application, he notarized signatures outside of the signatories' physical presence, including signatures he knew to be forgeries.

42. For example, Sojcher closed a loan involving Bernard and Patricia Laverty, knowing Laverty forged his wife's name on a July 14, 2007 real estate note and mortgage to Chestnut Hill. *Id.* at 82-83. When asked why he closed the loan, knowing that Patricia Laverty had not signed the document, Sojcher remarked: "Duress, enormous pressure, desperation on the part of Laverty & Company for this money. It was just the worst possible judgment." *Id.* at 105. When questioned, Sojcher could not say for sure whether, in connection with other transactions, including a May 24, 2005 transaction, Patricia Laverty signed for herself or whether her husband had signed for her, and effectively admitted that he had allowed Laverty to sign for his wife at times. *Id.* at 67, 82.

43. A review of real estate documents demonstrates that, prior to June 7, 2005, Sojcher notarized the forged signatures of Patricia Laverty on many other documents as well. *Compare* Ex. X, Mortgage, Security Agreement, and Assignment of Rents and Leases granted to Chestnut Hill by the Lavertys on January 26, 2002, purportedly signed by Patricia Laverty and notarized by Sojcher *with* Mortgage, Security Agreement and Assignment of Rent and Leases granted to MDB Realty Trust by the Lavertys on May 24, 2005, also purportedly signed by Patricia Laverty and notarized by Sojcher, a true and correct copy of which is attached hereto as Exhibit Y. Continental's expert, handwriting examiner Nancy McCann, opined that it is "highly probable" more than one person signed the name Patricia Laverty on these documents. *See* November 19, 2008 Questioned Document Report ("McCann Report"), a true and correct copy of which, without exhibits, is attached hereto as Ex. Z, at 6. McCann's report notes that "highly probable" is the "highest degree of probability rendered short of absolute certainty." *Id.*

44. Moreover, from the documents produced in this case, it is clear that: (1) one of Sojcher's employees notarized the patently forged signature of Georgette Clements on the May 30, 2003 Condominium Unit Deed conveying 111 West 8th Street, Unit T, from KBF Sales Corporation to Richard Sharp; and (2) Sojcher notarized the patently forged signature of Clements on the September 30, 2003 Guaranty prepared in connection with Stuart Family Irrevocable Trust's loan to BLJ Realty LLC. True and correct copies of these documents are attached hereto as Exhibits AA and BB respectively, and can be compared with Exs. DD, JJ, and KK also signed by Clements. Ms. McCann opined that it is "highly probable" that the Clements' signatures on Exs. AA and BB are "not genuine." Ex. Z, McCann Report, at 6.

45. In addition, Sojcher admitted under oath that, prior to June 7, 2005, he notarized a signature he knew to be a forgery in another case. Specifically, in a deposition given in the

*Coyne v. Smith* lawsuit, in which Sojcher is named as a defendant and charged with legal malpractice (*see* Group Ex. L), Sojcher admitted that he notarized Claire Coyne's signature on a mortgage to Susan Smith on July 13, 2004. Ex. J, Sojcher's Depo. in Coyne at 51-52; 56-57. Sojcher conceded that Coyne did not sign her own name; rather, Susan Smith signed Coyne's name. *Id.* With respect to that transaction, Sojcher testified:

> Q: But you'd agree with me that even though you've notarized it that she appeared personally to sign this document, Claire Coyne did not do that, correct?
> A: Well, you've asked me that questions already.
> Q: Is that correct?
> A: It is correct.

*Id.* at 52

> Q: Claire Coyne, contrary to what you say in your notary signature and in the language [clarify what language], didn't personally appear and sign this document on July 13th, 2004, correct?
> A: No, she was not personally present.
> Q: And she did not sign that document on that day in your office, correct?
> A: No.
> Q: Susan Smith signed her name, correct?
> A: That is correct.
> Q: And you were there present watching Sue Smith sign Claire Coyne's name, correct?
> A: Correct.

*Id.* at 56-57.

46. When asked in this coverage action to admit that "one or more of the signatures on closing documents prepared in connection with the Transactions appears to be a forgery," Sojcher invoked his Fifth Amendment Privilege. Ex. G, Sojcher's Admissions at ¶ 66.

**Before Sojcher Signed The Application, He Closed At Least One Loan Knowing That He Had Not Obtained, And Did Not Intend To Obtain, Discharges Of Prior Liens Not Listed As Exceptions In The Title Insurance Policy He Issued**

47. Sojcher has admitted that, prior to June 7, 2005, the date on which he signed the Application, he closed at least one real estate transaction knowing that he had not obtained, and did not intend to obtain, discharges of prior liens not listed as exceptions in the title insurance

policy he issued. *See* July 12, 2007 letter from James B. Fox to Hilary A. Wyche, a true and correct copy of which is attached hereto as Ex. CC at 3.

48. Specifically, Sojcher admitted to counsel for First American that, in connection with a loan that closed on November 24, 2004, he issued a First American title insurance policy that did not include exceptions for three senior mortgages, even though he had not obtained, and did not intend to obtain, discharges for those prior liens, which were not listed as exceptions in the First American title insurance policy Sojcher issued. *Id.* First American denied coverage under the title insurance policy based on fraud. *Id.* at 4-5; *see also* Ex. W at 88-93.

49. Moreover, First American and Chestnut Hill allege that Sojcher failed to pay off and discharge senior mortgages at least six times in connection with the Transactions. *See* Exs. B and C. When asked to admit that he failed to note and/or arrange for the payoff, release, or discharge of prior liens in connection with these Transactions, Sojcher invoked his Fifth Amendment Privilege. *See* Ex. C, Sojcher's Admissions at ¶ 25.

**Before Sojcher Signed The Application (And Between That Date And The Inception Date Of The Policy), Sojcher Engaged In Other Deliberate And Intentional Conduct Outside The Standard Of Care For An Attorney**

50. All of conduct described in Paragraphs 51-66 below took place prior to June 7, 2005, the date on the Sojcher signed the Application, or in some instances between that date and the August 1, 2005 inception date of the Policy. *See infra* ¶¶ 51-56. In some cases, Sojcher has testified to certain recurring practices or patterns of conduct described below, without reference to specific dates. *See,* e.g., Ex. L, Sojcher's Depo. in Dowd at 67; 78; 105-06; 108-09; 112; 113-114. It is a fair inference from this testimony, as well as from Sojcher's assertion of his Fifth Amendment Privilege in this case, that the conduct in question began prior to submission of the Application to Continental.

51. Sojcher closed many real estate transactions, including some at issue in the First American and Chestnut Hill Complaints, in which he had a conflict because he represented both the lender and the borrower. *See id.* at 18, 112.

52. Sojcher has admitted that he has represented both lender Defendant Chestnut Hill and borrower Bernard Laverty, either in Laverty's own capacity or as a trustee or manager of a realty entity or trust. *See id.* at 112. In recent deposition testimony, Sojcher admitted: "I was representing everybody. I mean, I was wearing a hat for everybody. I was representing Laverty; I was representing Levey; I was representing SD Corporation, Chestnut Hill Corporation. It was absurd. I was wearing a different hat for each person or entity. It was insanity." *Id.*

53. Sojcher was also aware that the borrowers in transactions he closed were not always using the loans at issue for their intended purpose, which generally was to fund condominium development projects. For example, in connection with a $200,000 loan from SD Corporation to B&S Realty Trust, which closed on September 23, 2003, Sojcher knew that the funds were not going to be used for the benefit of the trust, but instead would go to Laverty himself. Sojcher testified that Laverty:

> needed the money like he needed oxygen. He had debt service to make on various loans. He had a pretty nice lifestyle. He had cars; he had a home with a $7,000-a-month mortgage on it. He was involved with [Francis K.] Fraine in different projects. They had a huge American Express bill every month. They spent money like drunken sailors.

*See id.* at 21-22.

54. Likewise, Sojcher testified that 655 Corp., one of Fraine's "straw" companies discussed above in connection with the General Bank scam (Paragraphs 34-40) sought financing in order to develop condominiums in South Boston, but in fact, with the construction loan

proceeds it obtained, the borrowers "took the money and bought cars, traveled, houses . . . [t]hey never finished the project." Ex. M, Sojcher's Depo. in Shamus at 38, 61.

55. In addition to involving "hard money lenders" and borrowers who used loan proceeds for improper purposes, the Transactions themselves differed significantly from traditional real estate transactions. For example, they often involved short-term mortgages with interest rates as high as 24%. *See e.g.*, Affidavit of Understanding and Completion executed by Clements on April 6, 2005 in connection with a Levey/Chestnut Hill Loan, a true and correct copy of which is attached hereto as Ex. DD.

56. Sojcher has admitted to foregoing the formalities required on commercial loan transactions. For instance, when asked whether the LBM to 655 Corp. purported loan referenced above in connection with the General Bank scam were signed at closing or in advance, Sojcher testified: "there were some loosey-goosey things that went on through the years and who knows." Ex. M, Sojcher's Depo. in Shamus at 46-47.

57. At least twice prior to June 7, 2005, Sojcher's lender clients demanded that he foreclose on loans made to his borrower clients. On June 1, 2005, Sojcher, on behalf of Levey/SD Corporation, advised Laverty, Trustee of BJL Realty Trust, of SD Corporation's intent to foreclose on its mortgage on property located at 111 West 8th Street, Unit G. *See* June 1, 2005 Notice of Intention to Foreclose Mortgage, a true and correct copy of which is attached hereto as Ex. EE. On or around January 23, 2004, another of Sojcher's private lender clients, Phoenix Financial Corporation ("Phoenix"), demanded that Sojcher initiate foreclosure proceedings against several realty trust clients controlled by Laverty and Fraine: FKB Realty Trust, LLC, FKB Realty, LLC, BJL Realty Trust, and 1742 Liberty Street Realty. *See* January

23, 2004 facsimile from Vincent Rocha of Phoenix to Sojcher, a true and correct copy of which is attached here to as Ex. FF.

58. Sojcher often loaned money to clients. He testified that he has given Laverty "thousands of dollars" in personal loans and in connection with Laverty's business projects, including a $200,000 loan in the summer of 2005 toward a project in West Roxbury. Ex. L, Sojcher's Depo. in Dowd at 76. When asked where he got the money to make these loans to Laverty, Sojcher testified: "I robbed Peter to pay Paul . . . . It came from bank loans I did; it came from a float; it just – I don't know how I was able to do it." *Id.* at 76-77.

59. Sojcher also admitted that he and he wife, Diane L. Gilbert, made loans to his client Susan Smith in and around 2004 and 2005, sometimes at the request of Aiden Hughes, one of Fraine's associates. Ex. J, Sojcher's Depo. in Coyne at 14-17; 115-16. According to Sojcher, "Aiden Hughes was Frank Fraine's surrogate son. He supposedly did construction and got drunk at night all the time." Ex. M, Sojcher's Depo. in Shamus at 35-36.

60. When Sojcher's wife, Diane Gilbert, was deposed about the loans to Susan Smith, Ms. Gilbert admitted that she had never met Susan Smith, that she has not seen the loan documents before the day of the deposition and that she signed the documents because Sojcher told her to do so. Deposition of Diane Gilbert, taken on May 22, 2006 in the Coyne Lawsuit, a true and correct copy of which is attached hereto as Exhibit GG, at 10; 19-20; 33; 35.

61. Sojcher also made small personal loans to Smith, "$500 here and maybe $1,000 there" because he was "trying to help her out." Ex. J, Sojcher's Depo. in Coyne at 115-16.

62. In addition to making loans to clients, Sojcher accepted personal loans from clients. Chestnut Hill loaned Sojcher $700,000 on July 14, 2005. *See* July 14, 2005 Mortgage, Security Agreement and Assignment of Leases and Rents by Chestnut Hill to Sojcher, a true and

correct copy of which is attached hereto as Ex. HH. Just two months later, Sojcher obtained a $315,000 personal mortgage from another lender client, Phoenix. *See* September 16, 2005 Mortgage, Security Agreement and Assignment of Leases and Rents, a true and correct copy of which is attached hereto as Ex. II.

63. Sojcher served as the officer, manager or trustee of certain "straw" borrowers controlled by Fraine. Regarding Foundry Realty, LLC, Sojcher stated: "I was the manager. I was a straw manager. I borrowed money. I gave a bunch of money to pay off the first mortgage. I gave $100,000 to Laverty and then made various payments to take care of various loan obligations. Mr. Fix-It, that's me." Ex. L, Sojcher's Depo. in Dowd at 109.

64. FKB Realty, LLC is one of the borrowers in connection with a loan from Levey/Chestnut Hill. *See* Ex. C, First American Complaint at 11; Sojcher filed the initial paperwork to set up FKB Realty, LLC, and made himself the manager. *See* FKB Realty LLC 2004 Annual Report, a true and correct copy of which is attached hereto as Ex. JJ.

65. Sojcher continued as manager of FKB Realty, LLC until April 6, 2005, days before the loan closed. *See* April 6, 2005 Certificate of Manager, a true and correct copy of which is attached hereto as Ex. KK; Ex. D, Chestnut Hill Complaint at 5-6. On that date, Sojcher prepared and signed a "Certificate of Manager," in which he resigned as manager of FKB Realty, LLC and Clements was appointed. *See* Ex. KK, Certificate of Manager.

66. As noted in Paragraph 40, when asked at a deposition earlier this year if he had created fraudulent documents, Sojcher admitted: "It is possible I did in the past, yes." *Supra* ¶ 40.

**Before Sojcher Signed the Application, He Had Reason To Believe**
**That Stuart Levey and/or Levy's Company Would Make A Claim Against Him**

67. Sojcher has known Levey for approximately twelve years and Sojcher has represented Levey, or entities that he controls, in more than thirty loan transactions. Ex. B, Chestnut Hill's Interrogatory Responses at 3.

68. Even though Sojcher had known Levey for almost a decade by that date, on April 4, 2005, Levey's company, Chestnut Hill, requested a copy of Sojcher's malpractice insurance policy and assurances that it was paid through a certain date. *See* Ron Pearson's April 4, 2005 e-mail to Sojcher, a true and correct copy of which is attached hereto as Ex. NN, at 2.

69. Also, days before a real estate transaction was to close, Levey wrote an e-mail to Sojcher, stating: "Lastly please do not do anything that would be for the benefit of Frank [Fraine] *et al*. It's not worth you[r] livelihood!!!!! (ALL PAPERWORK MUST BE RIGHT)." *See* Stuart Levey's April 14, 2005 e-mail to Sojcher, a true and correct copy of which, with handwritten notes, is attached hereto as Ex. MM.

**Continental Issued the Policy In Reliance On Sojcher's Application**

70. The process of underwriting a lawyers professional liability insurance policy involves the receipt, review and analysis of timely and accurate information supplied by the applicant in order to allow the insurer to evaluate fairly the potential risks for which coverage is sought and determine whether, and, if so, upon what terms, a policy of insurance will be issued. Declaration of Lucy Aiello ("Aiello Decl."), filed concurrently herewith, at ¶ 5.

71. In order to evaluate the risk fully, it is important, among other things, that the underwriter have an accurate understanding of any known potential claims that may be made against the applicant. In this regard, an underwriter reviews and relies on, among other things,

responses to the questions in the application about circumstances that may give rise to a claim. It is critical to the underwriting process that this information be accurate and complete. *Id.*

72. Continental issued the Policy in reliance upon the accuracy and completeness of the information provided to it by Sojcher in the underwriting process and, in particular, in the Application. Aiello Decl. at ¶ 4; Ex. E, Application.

73. The following circumstances are material to the underwriting of a lawyers professional liability insurance policy: (a) the insured participated in a sham transaction designed to induce a federally-insured lender to make a multi-million dollar loan; (b) the insured notarized signatures outside of the signatories' physical presence, including signatures the insured knew to be forgeries; (c) the insured closed at least one loan transaction knowing that he had not obtained, and did not intend to obtain, discharges of prior liens not listed as exceptions in the title insurance policy he issued; and/or (d) the insured engaged in other deliberate and intentional conduct outside the standard of care. Aiello Decl. at ¶ 8.

74. If Sojcher had disclosed in the Application that he had engaged in any one of the types of conduct described in Paragraph 73, Continental would not have issued the Policy. Aiello Decl. at ¶¶ 8-9.

**<u>Sojcher's Bad Faith Claim</u>**

75. Sojcher has filed a Counterclaim in this Action, asserting three counts: breach of agreement, violations of M.G.L. Ch. 93A and 176D, and breach of the implied covenant of good faith and fair dealing. A true and correct copy of Sojcher's Answer and Counterclaim is attached hereto as Ex. NN.

76. In its Reply to Sojcher's Counterclaim, Continental denied all allegations of wrongdoing made by Sojcher and specifically denied that any of its actions in connection with

the claims against Sojcher have been improper or in bad faith. A true and correct copy of Continental's Reply to Sojcher's Counterclaim is attached hereto as Ex. OO.

77. Continental has provided Sojcher with a defense, through independent counsel of his choice, in connection with The First American and Chestnut Hill Lawsuits, subject to a full reservation of rights. *See*, e.g., Continental's coverage letters to Sojcher dated November 2, 2006, January 9, 2007 (misdated January 9, 2006) and July 2, 2007 attached hereto as Group Exhibit PP; Declaration of Kelly V. Overman, filed concurrently with Continental's Motion ("Overman Decl.") at ¶ 2.

78. Continental served Sojcher with certain interrogatories, including Interrogatory No. 10, requiring him to: "state the basis for [his] claims that Continental breached the terms of the Policy, violated M.G.L. Chapters 93A and 176D, and/or breached the implied covenant of good faith and fair dealing." Sojcher did not provide a substantive answer, but instead asserted his Fifth Amendment Privilege. *See* Ex. H, Sojcher's Interrogatories, at ¶ 10.

79. Continental also served Sojcher with certain requests for production of documents, including Document Request 11, which asked Sojcher to produce "[a]ll documents that support the allegations in your Counterclaim that Continental breached the terms of the policy, violated M.G.L. Chapters 93A and 176D, and/or breached the implied covenant of good faith and fair dealing." Sojcher did not provide a substantive responses, and did not produce any documents in response to this discovery requests, but instead asserted his Fifth Amendment privilege. *See* Ex. I, Sojcher's Response to Document Requests at ¶ 11.

80. Continental has noticed Sojcher's deposition three times. Overman Decl. at ¶¶ 4-7. Continental rescheduled the deposition twice, at Sojcher's request. Overman Decl. at ¶¶ 5-7.

The third time, Sojcher cancelled the deposition the day before it was scheduled (after Continental's counsel had already arrived in Boston). Overman Decl. at ¶¶ 8-9.

December 12, 2008

Respectfully submitted,

By: /s/ Richard A. Simpson

Richard A. Simpson (admitted *pro hac vice*)
rsimpson@wileyrein.com
Kelly V. Overman (admitted *pro hac vice*)
koverman@wileyrein.com
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000 (phone)
(202) 719-7049 (fax)

Regina E. Roman
roman@srbc.com
William Boesch
boesch@srbc.com
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street
Boston, Massachusetts 02114-4737
(617) 227-3030 (phone)
(617) 523-4001 (fax)

*Counsel for Plaintiff Continental Casualty Company*

## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed through the ECF system, and that I am therefore relying on the system to complete service by sending copies of the filing electronically to the necessary counsel, who are registered participants.

/s/ William L. Boesch

WR12933224v2
SRBC410789.1