**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| CONTINENTAL CASUALTY COMPANY, Plaintiff, | ) | |
| vs. | ) | Civil Action No. 07-CV-11598 RGS |
| STUART H. SOJCHER, ESQ., et al. Defendants | ) | |

**MEMORANDUM IN SUPPORT OF CONTINENTAL CASUALTY COMPANY'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Continental Casualty Company ("Continental") filed this action seeking a judicial declaration that it is entitled to rescind Lawyers' Professional Liability Policy No. LAW-268022438 (the "Policy"), issued by Continental to Stuart H. Sojcher ("Sojcher") for the August 1, 2005 to August 1, 2006 policy period (the "Policy") because Sojcher made material misrepresentations in his application. Sojcher has sought coverage under the Policy for, among other things, lawsuits brought against him by Defendants Chestnut Hill Private Mortgage Co., Inc. f/k/a Chestnut Hill Mortgage and Realty, Inc. and SD Corporation (collectively, "Chestnut Hill") and First American Title Insurance Company ("First American"), which allege that Sojcher mishandled several real estate transactions.

For purposes of this Motion, it is not necessary to consider the details of the complicated transactions at issue in the First American and Chestnut Hill Complaints (the "Transactions"). Sojcher's admissions that he engaged in fraudulent and intentional misconduct while handling

the Transactions and similar real estate transactions, before he submitted his application for coverage to Continental, establish Continental's right to rescind the Policy.

In this regard, Question 3 of the application for the Policy, which Sojcher signed on June 7, 2005, asked if Sojcher was aware of "any facts, omissions, or circumstances which a reasonable person would expect may give rise to a professional liability claim . . . ." Sojcher responded "no" to Question 3, even though he has admitted that, prior to submission of the application, he: (1) participated in a "sham" transaction designed to induce a federally-insured lender to make a multi-million dollar loan; (2) notarized signatures outside of the signatories' physical presence, including signatures he knew to be forgeries; (3) closed at least one real estate transaction knowing that he had not obtained, and did not intend to obtain, discharges of prior liens not listed as exceptions in the First American title insurance policy he issued; and (4) engaged in other deliberate and intentional conduct outside of the standard of care for an attorney. Having admitted to this pre-application intentional misconduct, Sojcher indisputably was aware of "acts, omissions or circumstances which a reasonable person would expect might reasonably be expected to be the basis of the claim" against him. Had Sojcher disclosed ***any of these circumstances*** in response to Question 3 of the application, Continental would not have issued the Policy.

In short, Sojcher's representations in the application for the Policy were both false and material to the risk that Continental assumed in insuring him. Accordingly, Continental is entitled to a judgment rescinding the Policy and determining that no coverage is available under the Policy for any claims made against Sojcher, including without limitation the claims asserted by First American and Chestnut Hill.

In addition, there is no basis whatsoever for the allegations in Sojcher's Counterclaim that Continental's actions in this matter were improper or in bad faith. Accordingly, Sojcher's Counterclaim should be dismissed.

## II. UNDISPUTED MATERIAL FACTS[1]

### A. The Policy and the Application

The Policy's Insuring Agreement provides as follows:

> I. INSURING AGREEMENT
>
> A. Coverage
>
> The **Company** agrees to pay on behalf of the **Insured** all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the **policy period** by reason of an act or omission in the performance of **legal services** by the **Insured** or by any person for whom the **Insured** is legally liable, provided that:
>
> 1. the **Insured** did not give notice to a prior insurer of such **claim** or a **related claim**;
>
> 2. the **Insured** did not give notice to a **prior insurer** of any such act or omission or **related act or omission**;
>
> 3. there is no other policy, whether primary, contributory, excess, contingent, or otherwise which provides insurance to any **Insured** for the **claim** based on or arising out of an act or omission in the performance of **legal services** by such **Insured** or by any person for whom the **Insured** is legally liable while affiliated with a firm other than the **Named Insured**.

SOMF at ¶ 5, Ex. A at § I.A. Words in bold are defined terms in the Policy.

Section V.L. of the Policy, "Entire Contract" provides, in relevant part:

[1] Continental incorporates by reference its simultaneously-filed Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("SOMF"). This section summarizes and refers to the SOMF. Unless otherwise noted, all references to "exhibits" are exhibits to the SOMF.

> By acceptance of this Policy, the **Insured** agrees that:
>
> 1. all of the information and statements provided to the **Company** by the **Insured** are true, accurate and complete and shall be deemed to constitute material representations made by all the Insureds;
>
> 2. this Policy is issued in reliance upon the Insured's representations; and
>
> 3. this Policy, endorsements thereto, together with the completed and signed application and any and all supplementary information and statements provided by the **Insured** to the **Company** (all of which are deemed to be incorporated herein) embody all of the agreements existing between the **Insured** and the **Company** and shall constitute the entire contract between the **Insured** and the **Company.**
>
> No oral or written misrepresentations made in the negotiation of this Policy of insurance by the **Insured** or in his or her behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation is made with actual intent to deceive, or unless the matter misrepresented increased the risk of loss. Notwithstanding the foregoing, this policy will be null and void only with respect to those **Insureds** who participate in, or who have knowledge of, or who should have knowledge of, the misrepresentation of any material matter in the negotiation of this Policy or application.

SOMF at ¶ 6, Ex. A at § V.L. (italic emphasis added).

In order to obtain the Policy, Sojcher submitted to Continental his "Renewal Application for MBA Lawyers Professional Liability Insurance Claims Made Basis" (the "Application"), which he signed on June 7, 2005. SOMF at ¶ 7. Question 3(a) of the Application asked:

> a) Is the firm, or any attorney affiliated with the firm, aware of any facts, omissions or circumstances which a reasonable person would expect may give rise to a professional liability claim in the future against the firm, any predecessor firm, or any current or former attorney of the firm while affiliated with the firm, which has not been reported to CNA?

SOMF at ¶ 8; Ex. E at 1. Sojcher checked the box next to "No" in response to Question 3(a).

SOMF at ¶ 9. Sojcher signed the Application below warranty language, which provided:

> Applicant further warrants [that] . . . neither applicant nor any of its partners, directors, associates, managers, members or employees are aware of any act or omission or related acts or omissions in the rendering of legal services which a reasonable person would view as likely to give rise to a claim in the future.
>
> * * *
>
> Further, Applicant and each and every partner, officer, director, associate, manager, member and employee understand and acknowledge that:
>
> 1. If a policy is issued, the Company will have relied upon as representations: the application and any supplemental applications, and any other statements furnished to the Company in conjunction with this application, all of which are hereby incorporated by reference into the application and made a part hereof;
>
> 2. This application will be the basis of the contract and will be incorporated by reference into and made part of such policy; and
>
> 3. Applicant's failure to report to its insurance company during the policy term any claim made against it . . . and any act, omission, or circumstance which may give rise to a claim in the future against it or any of its partners, officers, directors, associates, managers, members or employees may create a lack of coverage.

SOMF at ¶ 10; Ex. E at 2.

### B. <u>The First American and Chestnut Hill Lawsuits</u>

First American and Chestnut Hill have filed lawsuits against Sojcher, coverage for which is sought under the Policy. SOMF at ¶ 11. Both complaints allege that Sojcher mishandled real estate transaction in many ways, including by failing to pay off prior liens of record on the properties. *Id.* In general, these properties were transferred and refinanced several times during the relevant period and were used as collateral to secure non-conventional loans. *Id.* First

American asserts in its Complaint that, in connection with nine real estate transactions, closed during the 2003 to 2006 time period, Sojcher: (i) failed to remit title policies and premiums to First American; (ii) issued title polices on condominiums after the expiration of phasing rights adversely affecting title; (iii) failed to obtain necessary mortgage discharges and releases on mortgaged properties; and (iv) failed to properly pay off existing liens, as required by the First American title policies that Sojcher issued. *Id.* at ¶ 12.

According to the Chestnut Hill's Complaint, in the 2003 to 2006 time period, Sojcher introduced Stuart Levey, Chestnut Hill's principal, and Levey's affiliate companies, to lending opportunities, issued title insurance policies in connection with the resulting transactions, and then closed the loans on their behalf. *Id.* at ¶ 14. Chestnut Hill alleges that, in connection with four loan transactions, Sojcher's negligence caused Chestnut Hill damages, including by: (i) failing to ensure that the stated collateral was what Sojcher represented it to be; (ii) failing to obtain and deliver title policies paid for at closing; (iii) failing to obtain payoff letters and discharges of senior mortgages; (iv) failing to provide and record loan documentation that reflected the existence of the loans; (v) failing to advise plaintiffs of legal risks associated with cross-collateralizing loans with non-borrowers; and (vi) improperly serving as counsel for the borrowers in the same transactions in which he represented Chestnut Hill as the lender, without first obtaining the lender's consent. *Id.* at ¶ 15.

**C. <u>Stuart Sojcher</u>**

Sojcher was disbarred from the practice of law on June 28, 2007, for the commingling and conversion of real estate sale proceeds for his own use, and for the failure to pay off and discharge outstanding obligations in real estate transactions. *Id.* at ¶ 17; Ex. F. In the Disbarment Judgment, among other things, the Massachusetts Supreme Judicial Court noted that Sojcher's "failure to promptly pay off [prior, senior] liens and mortgages and to secure the

necessary discharges violated Mass. R. Prof. C. 1.2(a) (lawyer shall seek the lawful objectives of his client) and 1.15(c) (a lawyer must promptly turn over funds to the persons entitled to receive them)." *Id.* at ¶ 18; Ex. F.

Sojcher has invoked his Fifth Amendment privilege against self-incrimination ("Fifth Amendment Privilege") in response to all of Continental's discovery requests in this case. SOMF at ¶ 19; Exs. G-I. Furthermore, Sojcher's counsel has stated that Sojcher will assert his Fifth Amendment Privilege in response to all substantive deposition questions directed to him. *See* Ex. 5 to Declaration of Kelly V. Overman ("Overman Decl"), filed concurrently with Continental's motion. However, Sojcher has given deposition testimony in connection with at least three other cases involving some of the same transactions and events at issue here. *See generally* Exs. J, L and M. In those depositions, Sojcher has testified about both the general types of transactions in which he was involved and the specifics of certain transactions. *See generally id.*

Prior to his suspension and disbarment, Sojcher was an attorney in Massachusetts, whose practice focused on real estate law. SOMF at ¶ 20. Until May 16, 2006, when First American suspended Sojcher's agency contract, Sojcher was a title issuing agent for First American. *Id.* As part of his real estate practice, Sojcher prepared loan documentation and conducted closings. *Id.* In describing under oath his behavior in the transactions at issue in the First American and Chestnut Hill Complaints, Sojcher alternately has blamed others, joked about writing a tell-all book, hinted at suicide, and asserted his Fifth Amendment Privilege. *Id.* at ¶ 21.

In addition to the First American and Chestnut Hill Lawsuits, since June 7, 2005, at least six other lawsuits have been filed against Sojcher. *Id.* at ¶ 22. Just last month, another lawsuit was filed, *Fidelity National Title Insurance Co. v. Sojcher*, Case No. 08-3743, in the Superior

Court of Suffolk County, Massachusetts alleging that Sojcher's actions exposed title insurer Fidelity to well over $512,000 in liability – and Sojcher is not even a Fidelity agent. *Id.* at ¶ 23.

### D. Other Individuals and Entities Involved in the Transactions

Sojcher has characterized the others involved with him in the transactions at issue in the First American and Chestnut Hill Complaints (the "Transactions") as follows: "[W]ell, I'm a disbarred attorney who did terrible things and so on and so forth; but look at the people who I was involved with. Really nice people. Vermin and scum of the earth." *Id.* at ¶ 24.

#### 1. Frank Fraine and His Straw Companies

Sojcher has testified that Frank Fraine was "the puppeteer" behind the Transactions, and was the true owner and manager of several of the business entities referred in the Complaints. *Id.* at ¶ 25. Fraine, a convicted felon with reported ties to organized crime, ran his business out of an operation called the "Foundry." *Id.* at ¶ 26. Sojcher, who acted as manager of Foundry Realty, LLC, has testified that the individuals associated with Fraine and the Foundry were a "den of thieves." *Id.* As Sojcher put it, although Fraine "could have not used his name . . . with respect to the real estate empire he was trying to build . . . he basically called the shots." *Id.* Sojcher testified that Fraine had others acting as "straws." *Id.*

#### 2. Bernard J. Laverty

Bernard J. Laverty, Jr. is a former partner of Fraine, who participated in several of the Transactions, either in his individual capacity or as a trustee or officer of a borrower entity. *Id.* at ¶ 27. In connection with a March 2004 mortgage, Laverty signed on behalf of four Fraine companies. *Id.* at ¶¶ 25, 27. According to Sojcher, "Laverty has been known in the past to sign others people's names. He has defrauded many people . . . ." *Id.* at ¶ 28. Sojcher has been aware since 2002 that Laverty has forged the signatures of others. *Id.* Sojcher testified that he saw Laverty forge the signatures of others – Laverty's wife, Frank Fraine – on "[a] number of

occasions," including on a loan application completed for a transaction in which Sojcher acted as the closing attorney. *Id.* Sojcher has called Laverty "scum" and remarked: "There is a clear pattern of his lies and deception for several years." *Id.* at ¶ 29.

**3. <u>Georgette Clements</u>**

Georgette Clements is Fraine's daughter-in-law, who Fraine often asked to conduct business for him. *Id.* at ¶ 30. In connection with the bankruptcy proceedings for BLJ Realty, LLC, Clements admitted that she has no experience in developing real estate and that all of the actions that she took on behalf of BLJ Realty, LLC were at Fraine's instruction. *Id.* at ¶ 31.

**4. <u>Stuart Levey and His Companies</u>**

Sojcher represented Stuart Levey and his lender companies, including Chestnut Hill and SD Corp., in over thirty transactions. *Id.* at ¶ 32. Chestnut Hill is a "hard money" lender, rather than a traditional commercial lender, and generally offered short-term loans at high interest rates. *Id.* at ¶ 32; Ex. DD. Chestnut Hill's principal, Levey, would only make certain loans if residential property used as collateral was transferred to a trust, otherwise the unfavorable loan terms he offered would not comply with Massachusetts usury regulations. SOMF at ¶ 32.

**5. <u>LBM Financial, LLC</u>**

LBM Financial, LLC ("LBM") is a private mortgage company purportedly run by Marcello M. Mallegni ("Mallegni"). *Id.* at ¶ 33. Sojcher testified that LBM's representatives, including Mallegni and LBM attorney Michael J. Norris, are "liars." *Id.* at ¶ 33. According to Sojcher, LBM operated outside of the general framework for lenders, stating that, as a "general practice," LBM did not sign documents and did not give discharges. *Id.* at ¶ 33.

**E. <u>Before Sojcher Signed the Application, He Participated in a Sham Transaction Designed to Induce a Federally-Insured Lender To Make a Multi-Million Dollar Loan</u>**

Sojcher has admitted that, prior to June 7, 2005, the date on which he signed the

Application, he participated in a sham transaction designed to induce a federally-insured lender to make a multi-million dollar loan. *Id.* at ¶¶ 34-37. Specifically, 655 Corporation, one of Fraine's "straw" companies, was created to develop condominium units at 655 West Second Street, in South Boston. *Id.* at ¶ 35. General Bank was willing to lend $5.6 million to 655 Corporation, but only if 655 Corporation first arranged for $1.2 million in capital to be infused into the company to pay down a pre-existing debt that would have a superior interest in the collateral to General Bank. *Id.* In order to create the illusion that this condition had been satisfied, the parties seeking the loan from General Bank documented a transaction whereby LBM purportedly loaned $1.2 million to 655 Corporation, which used the loan proceeds to pay down the pre-existing debt. *Id.* In fact, however, and contrary to the deal documentation submitted to General Bank, LBM never paid the $1.2 million to 655 Corporation. *Id.* Sojcher not only conducted the title search for this fraudulent transaction but also signed a "Guaranty" as Manager of Foundry Realty, LLC, another one of Fraine's straw companies, in partial security on the purported loan from LBM to 655 Corp**.** *Id.* at ¶ 36; Ex. V.

Sojcher expressly has acknowledged under oath that the loan for LBM to 655 Corp. was a "sham." SOMF at ¶ 37. He testified to the mechanics of the scam: "the LBM to 655 Corporation or the alleged loan was purportedly set up and documented to induce General Bank to lend money to 655 Corporation." *Id.* He further testified: "I mean, if you look at it, it looks like a purchase[] money mortgage, but it wasn't a purchase[] money mortgage. But no money changed hands. The[] only money that changed hands was the money that LBM used to record documents." *Id.*

Laverty, who signed as Manager of 655 Corp. in connection with the transaction, has confirmed that the LBM to 655 Corp. loan was a sham designed to deceive General Bank. *Id.* at

38. He testified:

Q: And you were involved in the discussions, were you not, where 655 Corp. was going to advise General Bank that they had satisfied General Bank's underwriting standards by infusing $1.2 million and paying down the [prior] debt?
A: Correct.
Q: But that wasn't true, was it?
A: No . . .
** **
Q: So there was no money paid anyway?
A: None.
Q: So that transaction was a sham, if you will, created only to attempt to illustrate equity in the property so the General Bank would make the loan?
A: Absolutely.

*Id.*

**F. <u>Before Sojcher Signed the Application, He Notarized Signatures Outside of the Signatories' Physical Presence, Including Signatures He Knew To Be Forgeries</u>**

Sojcher has testified under oath that, prior to June 7, 2005, the date on which he signed the Application, he notarized signatures outside of the signatories' physical presence, including signatures he knew to be forgeries. *Id.* at ¶¶ 41-46. For example, Sojcher closed a loan involving Bernard and Patricia Laverty, knowing Laverty forged his wife's name on a July 14, 2007 real estate note and mortgage to Chestnut Hill. *Id.* at ¶ 42. When asked why he closed the loan, knowing that Patricia Laverty's signature was a forgery, Sojcher remarked: "Duress, enormous pressure, desperation on the part of Laverty & Company for this money. It was just the worst possible judgment." *Id.*

Review of real estate documents demonstrates that, prior to June 7, 2005, Sojcher notarized the forged signatures of Patricia Laverty on many other documents as well.[2] *Id.* at ¶

[2] When questioned, Sojcher could not say for sure whether, in connection with other transactions, Patricia Laverty signed for herself or whether her husband had signed for her, and effectively admitted that he had allowed Laverty to sign for his wife at times. SOMF at ¶ 42. In response to Continental's request for admission that "one or more of the signatures on closing documents prepared in connection with the Transactions appears to be a forgery," Sojcher invoked his Fifth Amendment Privilege. *Id.* at ¶ 46; Ex. G at ¶ 66.

43. Continental's expert, handwriting examiner Nancy McCann, opined that it is "highly probable," which is the "highest degree of certainty rendered short of absolute certainty," that more than one person signed the name Patricia Laverty on multiple documents specifically referenced in Continental's Statement of Material Facts. *Id.*; Ex. Z. Moreover, from the documents produced in this case, it is clear that: (1) one of Sojcher's employees notarized the patently forged signature of Georgette Clements on the May 30, 2003 Condominium Unit Deed conveying 111 West 8th Street, Unit T, from KBF Sales Corporation to Richard Sharp; and (2) Sojcher notarized the patently forged signature of Clements on the September 30, 2003 Guaranty prepared in connection with Stuart Family Irrevocable Trust's loan to BLJ Realty, LLC. SOMF at ¶ 44. Ms. McCann opined that it is "highly probable" that the Clements' signatures on Exhibits TT and UU are "not genuine." *Id.*; Ex. Z.

In addition, Sojcher also admitted under oath that, prior to June 7, 2005, he notarized Claire Coyne's signature on a mortgage to Susan Smith on July 13, 2004. *Id.* at ¶ 45. Sojcher conceded that Coyne did not sign her own name; rather, Susan Smith signed Coyne's name. *Id.* With respect to that transaction, Sojcher testified:

> Q: But you'd agree with me that even though you've notarized it that she appeared personally to sign this document, Claire Coyne did not do that, correct?
> A: Well, you've asked me that question already.
> Q: Is that correct?
> A: It is correct.
> * * *
> Q: Claire Coyne, contrary to what you say in your notary signature and in the language [clarify what language], didn't personally appear and sign this document on July 13th, 2004, correct?
> A: No, she was not personally present.
> Q: And she did not sign that document on that day in your office, correct?
> A: No.
> Q: Susan Smith signed her name, correct?
> A: That is correct.
> Q: And you were there present watching Sue Smith sign Claire Coyne's name, correct?

A: Correct.

*Id.*

**G. Before Sojcher Signed the Application, He Closed at Least One Loan Knowing that He Had Not Obtained, and Did Not Intend to Obtain, Discharges of Prior Liens Not Listed as Exceptions in the First American Title Insurance Policy He Issued**

Sojcher has admitted that, prior to June 7, 2005, the date on which he signed the Application, he closed at least one real estate transaction knowing that he had not obtained, and did not intend to obtain, discharges of prior liens not listed as exceptions in the title insurance policy he issued. *Id.* at ¶¶ 47-49.

In particular, Sojcher admitted to counsel for First American that, in connection with a loan that closed on November 24, 2004, he issued a First American title insurance policy that did not include exceptions for three senior mortgages, even though he had not obtained, and did not intend to obtain, discharges for those prior liens, which were not listed as exceptions in the First American title insurance policy Sojcher issued. *Id.* at ¶ 48. First American denied coverage under the title insurance policy based on fraud. *Id.*

Moreover, First American and Chestnut Hill allege that Sojcher failed to pay off and discharge senior mortgages at least six times in connection with the Transactions. *Id.* at ¶ 49. When asked to admit that he failed to note and/or arrange for the payoff, release, or discharge of prior liens in connection with these Transactions, Sojcher invoked his Fifth Amendment Privilege. *Id.*

**H. Before Sojcher Signed the Application (and Between that Date and the Inception Date of the Policy), Sojcher Engaged in Other Deliberate and Intentional Conduct Outside the Standard of Care for an Attorney**

As detailed in Continental's Statement of Material Facts, Sojcher has admitted that, before he signed the Application on June 7, 2005, or in some instances between that date and the

August 1, 2006 inception date of the Policy,[3] he engaged in multiple other acts of deliberate and intentional conduct outside of the standard of care.[4] *Id.* at ¶ 50. This conduct included the following; (1) creating fraudulent documents; (2) representing all sides to real estate transactions, including "straw" parties, notwithstanding obvious conflicts of interest; (3) closing transactions with borrowers who he knew were not using the loan proceeds for the intended purpose; (4) foregoing the formalities required on commercial loan transactions; (5) holding management or equity interests in entities for which he closed loan transactions; and (6) making loans to clients and receiving loans from clients. *Id.* at ¶¶ 51-66.

Furthermore, before he signed the Application, Sojcher had reason to believe that Levey or one of his companies would make a claim against him.[5] *See id.* at ¶¶ 68-69. In particular, even though Sojcher had known Levey for almost a decade, on April 4, 2005, Levey's company, Chestnut Hill, requested a copy of Sojcher's malpractice insurance policy and assurances that it was paid through a certain date. *Id.* at ¶ 68. Also, days before a real estate transaction was to close, Levey wrote an e-mail to Sojcher, stating: "Lastly please do not do anything that would

---

[3] The Application requires the potential insured to update its responses as necessary until the date on which the Policy incepts. *See* Ex. E at 2. In this regard, the Application provides:

> Applicant further warrants on its behalf and on behalf of each and every partner, officer, director, associate, manager, member and employee a continuing obligation to report to the Company immediately any material changes in all such information after signing the application and prior to the issuance of the policy, and acknowledges that the Company shall have the right to withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance based upon such changes.

*Id.*

[4] In some instances, Sojcher testified to certain recurring practices or patterns of conduct, without reference to specific dates. SOMF at ¶ 50. Continental submits that it is a fair inference from this testimony, as well as from Sojcher's assertion of his Fifth Amendment Privilege, that the conduct in question began prior to submission of the Application to Continental. *See id.* at ¶ 19.

[5] Sojcher acknowledged that documentation of the Transactions was sometimes given short shrift. For instance, when asked whether the documents relating to a purported loan from 655 Corp. to LBM in 2003 were signed at closing or in advance, Sojcher testified: "there were some loosey-goosey things that went on through the years and who knows." *Id.* at ¶ 56.

be for the benefit of Frank [Fraine] *et al*. It's not worth you[r] livelihood!!!!! (ALL PAPERWORK MUST BE RIGHT)." *Id.* at ¶ 69.

### I. Sojcher's Counterclaim

Sojcher filed a Counterclaim in this Action, asserting three counts: breach of agreement, violations of M.G.L. Ch. 93A and 176D, and breach of the implied covenant of good faith and fair dealing (collectively, "bad faith"). *See id.* at ¶ 75. In its Reply to Sojcher's Counterclaim, Continental denied all of Sojcher's allegations of wrongdoing and specifically denied that any of its actions have been improper or in bad faith. *Id.* at ¶ 76. When asked in an interrogatory to state the factual basis for his counterclaims against Continental, Sojcher did not substantively respond and instead asserted his Fifth Amendment Privilege. *Id.* at ¶ 78. Likewise, Sojcher asserted his Fifth Amendment Privilege in response to Continental's request for documents supporting the counterclaims. *Id.* at ¶ 79.

Continental has noticed Sojcher's deposition three times, and rescheduled it twice, at Sojcher's request. *Id.* at ¶ 80; Overman Decl. at ¶¶ 4-7. The third time, Sojcher unilaterally cancelled the deposition the day before it was scheduled (after Continental's counsel had already arrived in Boston), citing a medical condition. SOMF at ¶ 80; Overman Decl. at ¶¶ 8-9.

## III. ARGUMENT

### A. Continental Is Entitled to Rescind the Policy[6]

In Massachusetts, an insurer may rescind a policy based on a misrepresentation in the insured's application for coverage, as prescribed by M.G.L. c. 175, section 186 ("Section 186"). Section 186 provides:

[6] Continental limits this motion to its rescission claim, which is dispositive of the entire case. As set forth in Continental's complaint, the Policy bars coverage for some or all of First American and Chestnut Hill claims on other grounds as well.

> No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss.

*Id. See also TIG Ins. Co. v. Blacker*, 767 N.E. 2d 598 (Mass. Ct. App. 2002); *Shapiro v. Am. Home Assurance Co.*, 584 F. Supp. 1245 (D. Mass. 1984). Accordingly, an insurer is entitled to rescind a policy where the insured made a misrepresentation in the application for the policy that ***either*** was made with deceitful intent ***or***, if innocent, increased the insurer's risk of loss. *Blacker*, 767 N.E. 2d at 601.

Accurate responses to application questions about known circumstances that a reasonable person would expect may give rise to a claim are critical to underwriting a lawyers professional liability policy. As one commentator put it:

> Given the inherent uncertainty associated with risk, an insurer must be able to fully appreciate and predict the probability of future loss before underwriting the risk. Simply stated, the historical data provided by an insurance applicant is critical to the insurer, who uses that information to measure the likelihood of loss, to determine whether insurance might be available, and to ascertain how much can be afforded.

Mark Wade and Patricia A. Essoff, Lawyers Professionals Liability Insurance: A Primer on Prior Knowledge, 30 ABA Fall Brief 29 (2000) *see also Blacker*, 767 N.E. 2d at 602 (accurate information about an applicant's exposure to potential claims is fundamental to claims-made underwriting); 5 Ronald E. Mallen and Jeffrey M. Smith, Legal Malpractice §34:14, at 81 (2007 ed.) ("Mallen") ("a predicate to claims made coverage is that the insured neither know of a claim nor could have reasonably foreseen that a known circumstance might reasonably be expected to be the basis of a claim or suit"). Massachusetts courts have stressed that insurers need to receive from their insureds accurate application data. *St. Paul Fire & Marine Ins. Co. v. BHA*, 515

N.E.2d 363, 368 (Mass. App. 1987); *Boston Mutual Ins. Co. v. N.Y. Islanders Hockey Club,* 165 F.3d 93, 96 (1st Cir. 1999). Indeed, the purpose of the "any circumstances" question is to "enforce one of the primary axioms of insurance, namely, that insurance is intended to cover only the risk of unknown loss." Wade at 35; *Home Indem. Co. v. Toombs,* 910 F. Supp. 1569, 1572 (N.D. Ga. 1995).

For these reasons, insurers are entitled to rescind insurance policies when insureds fail to disclose material information regarding potential claims in response to direct questions in their insurance applications. *E.g. Prof'l Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis,* 799 F.2d 218, 221 (5th Cir. 1986) (affirming summary judgment for insurer based on insured's failure to disclose "ticking bomb" on application for policy).

### 1. <u>Sojcher Made a Misrepresentation in the Application</u>

There is no question that Sojcher made a misrepresentation in the Application. In response to Question 3, he responded "no" when asked if he was aware of "any facts, omissions, or circumstances which a reasonable person would expect may give rise to a professional liability claim." However, Sojcher's own admissions plainly demonstrate that his "no" response was patently false.[7]

Decisions by courts in Massachusetts and around the country, including one by this Court, recognize that policy and application language similar to that of Question 3 mandates an objective reasonable person standard. *See Volterra, Goldberg & Mangiaratti v. The Home Assurance Company of Indiana,* Civil Action No. 96-10885, slip op. at 1-2 (D. Mass. Dec. 18,

[7] Sojcher's admissions in other contexts are admissible in this action. Federal Rule of Evidence 801(d)(2), entitled "Admission by Party-Opponent," provides that a statement is not hearsay and thus is admissible if "[t]he statement is offered against a party and is the party's own statement, in either an individual or a representative capacity." Fed. R. Evid. 801(d)(2)(a). Though Sojcher made many of these admissions in other depositions under oath, the rule does not require the statement to be under oath so long as the statement is the party's own. *Id.*

1997) (Stearns, D.J.) ("the controlling term of the policy, the phrase 'reasonable basis . . . to foresee that a claim would be made" is to be gauged by an objective test . . . .") ("Volterra," is attached as Ex. 8 to the Overman Decl.); *Blacker*, 767 N.E. 2d at 602 (interpreting a nearly identical application question and remarking that this "provision refers to what a reasonable attorney would foresee given the insured's knowledge") (Massachusetts law); *Culver v. Cont'l Ins. Co.,* 11 Fed. Appx. 42, 45-46 (4th Cir. 1999) (applying Maryland law) (invoking "an objective standard of forseeability" where the policy application asked whether the applicant know of "any circumstance act error, or omission that could result in a claim or suit")*; Cont'l Cas. Co. v. Graham & Schewe,* 339 F. Supp. 2d 723, 727 (E.D. Va. 2004) (applying an objective standard to application question asking whether any attorney was "aware of … [a]n act or omission that may reasonably be expected to be the basis of a claim.") Accordingly, in determining whether Sojcher's response to Question 3(a) was false, the Court should analyze: (1) what Sojcher knew as of the date he signed the Application;[8] and (2) how a reasonable lawyer would construe the known facts. Mallen, §34:14 at 86.

Courts have consistently held that when a lawyer engaged in intentional wrongful conduct before submitting his application for professional liability insurance, he is deemed as a matter of law to have known facts potentially giving rise to a claim, and thus to have an obligation to disclose the facts on his application. For instance, in *Westport Ins. Corp. v. Gionfriddo*, 524 F. Supp. 2d 167 (D. Conn. 2007), the insured answered "no" to a question on his April 25, 2005 application that asked whether any insured was "aware of any fact or circumstance, act, error, omission, or personal injury which might be expected to be the basis of

[8] Although there is no need to reach the issue, as noted above, Sojcher was also required to supplement his application to disclose material changes up to the August 1, 2005 inception date of the Policy. *See e.g, Gabbett v. Conn. Gen. Life Ins. Co.*, 303 Mass. 433, 435 (1939); *Cont'l Ins. Co. v. Bahnan*, 216 F.3d 150, 155 (1st Cir. 2000); *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370 (1st Cir. 1991).

a claim or suit for lawyers or title agents professional liability." *Id.* at 171. Yet, on June 22, 2006, the insured admitted he had intentionally mishandled real estate transactions. Specifically, Gionfriddo admitted that he failed to pay off mortgages and instead used the mortgage payoffs to cover his personal financial debts, among other things. *Id.* at 172. Since Gionfriddo admitted to subverting the payoffs and to converting client funds from January 2000 to July 2005, the Court determined that he "had to be aware of his acts, errors, and omissions that could be expected to be the basis of a claim against him in April 2005 when he submitted his application for insurance coverage." *Id*. 175. In finding that Gionfriddo's misrepresentations had been "knowingly made" (under a more strict standard than required under Massachusetts law), the court remarked:

> The evidence in this case cannot support a conclusion that the misrepresentation made on Gionfriddo's application was simply the result of ignorance, mistake, or negligence. Gionfriddo was engaged in intentional misconduct during a four-year period that could have given rise to claims or suits against him. He was fully aware of this fact when he submitted his application to Westport. Thus, Gionfriddo knew that the information he was providing to Westport was false.

*Id*. at 176.

Likewise, in *Continental Casualty Co. v. Conroy, Ballman & Dameron, Chtd*, the Court held that the insured's knowledge of his own intentional misconduct prior to the policy's inception barred coverage for himself and his firm.[9] Civil Action No. AW-05-1082, slip op. (D. Md. Mar. 23, 2006) (attached as Ex. 7 to the Overman Decl.). In *Conroy,* the insured entered into a plea agreement, admitting to real estate fraud. The *Conroy* Court held the insured's

---

[9] In *Conroy*, coverage was barred by insuring agreement language similar to the application question at issue here. The *Conroy* policy required as a condition to coverage that, prior to the inception date of the first policy issued by the carrier, "no Insured had a basis to believe that any such act or omission or related act or omission, might reasonably be expected to be the basis of a claim." *See id.* at 6. Prior knowledge exclusion cases, like *Conroy* and *Westport Ins. Corp. v. Hanft & Knight, P.C.*, 523 F. Supp. 2d 444, 456 (M.D. Pa. 2007), involve the same analysis as the application question here: a determination of whether the insured was aware of facts that a reasonable lawyer would expect may give rise to a claim.

admissions amply supported the insurer's assertion that he had a basis to believe his actions might reasonably be expected to be the basis of a claim. *Id.* at 8. A reasonable person "would have expected that the victims of th[e] fraud could assert a claim against him and/or [his law firm]." *Id.* at 8. *See also First Am. Title Ins. Co. v. Lawson*, 827 A.2d 230 (N.J. 2003) (professional liability policy rescinded after lawyer made the material misrepresentation in application that he was "not aware of any circumstances or any allegations or contentions as to any incident, which may result in a claim being made against the firm or any of its partners" when he had engaged in unauthorized practice of law and misappropriated client funds).

This case is on all fours with *Gionfriddo*, *Conroy*, and *Lawson*: it arises out of underlying real estate transactions in which the insured has admitted to intentional misconduct, yet failed to disclose that conduct in his application for insurance coverage.[10] As detailed above, Sojcher has specifically admitted that, prior to June 7, 2005, he:

- participated in a "sham" transaction designed to induce a federally insured lender to make a multi-million dollar loan;
- notarized signatures outside of the signatories' physical presence, including some signatures he knew to be forgeries;[11]

[10] Of course, not all rescission cases involve pre-application intentional misconduct. Courts have ordered insurance policies rescinded in cases where the insured failed to disclose to an insurer its knowledge of acts, omissions or circumstances that could lead to a claim arising out of far less egregious conduct – including allegations of negligent conduct. *See e.g., Home Indemn. Co. v. Toombs,* 910 F. Supp. 1569 (N.D. Ga. 1995) (non-disclosure of voluntarily dismissal of client's case resulting from statute-of-limitations bar); *Graham & Schewe*, 339 F. Supp. 2d at 727 (non-disclosure of fact that convicted criminal client had been granted writ of habeas corpus on grounds of ineffective assistance of counsel and that he was acquitted upon retrial).

[11] Massachusetts has enacted Standards of Conduct for Notaries Public in order to "foster ethical conduct among notaries public." Mass. Exec. Order 455 (04-04), ¶ 3. These Standards of Conduct state that a "notary public shall not perform a notarial act if (1) the principal is not in the notary's presence at the time of the notarization; (2) the principal is not identified by the notary through satisfactory evidence of identity; . . . (5) the notary public is a party to or is named in the document that is to be notarized . . .; (6) the notary public will receive as a direct result of the notarial act any commission, fee, advantage, right, title, interest, cash, property, or other consideration exceeding in value the fees [statutorily allowed]." *Id.* at Section 6(a). In addition, a "notary public shall not execute a certificate containing information known or believed by the notary public to be false." *Id.* at

- closed at least one real estate transaction knowing that he had not obtained, and did not intend to obtain, the release of prior liens not listed as exceptions in the First American title insurance policy he issued; [12] and
- engaged in other deliberate and intentional conduct outside the standard of care for attorneys.

A reasonable person would recognize that any one of these circumstances alone is sufficient to require a "yes" response to Question 3 of the Application.[13]

As noted above, Sojcher has asserted the Fifth Amendment Privilege in response to all of Continental's discovery requests; he has not denied that he was subjectively aware of circumstances that might result in a claim, nor would any such denial have any credibility

---

Section 6(d).

[12] First American cannot dispute that Sojcher engaged in knowing, wrongful conduct prior to June 7, 2005. In its Opposition to Litton's Motion for Partial Summary Judgment, First American cites authority to distance itself from Sojcher's conduct in the November 24, 2004 loan transaction involving lender New Century Mortgage and borrower Georgette Clements. *See* Ex. 6 to Overman Decl., First American Title Insurance Company's Opposition to Litton Loan Servicing, L.P.'s Motion for Partial Summary Judgment in *Litton Loan Servicing, L.P. v. First Amer. Title Ins. Co.*, Case No. 1:07-cv-12330-RWZ, in the United States District Court for the District of Massachusetts, at 14. First American states: "Sojcher was acting in his own self-interest" and "Sojcher's ***fraudulent*** acts cannot be imputed to First American." *Id*. (emphasis added). Having conceded that Sojcher's pre-Application conduct in the November 24, 2004 loan transaction between Clements and New Century was fraudulent, First American cannot now argue that Sojcher did not engage in intentional misconduct prior to submitting the Application to Continental.

[13] As noted above, Continental was able to uncover these admissions of intentional conduct by examining Sojcher's testimony and admissions in other cases. Based on the First American claim, the Chestnut Hill claim, and the constellation of other problems (other lawsuits, title claims and disciplinary matters) that have arisen from Sojcher's conduct during the 2003 to 2006 period, it is highly likely that Sojcher engaged in additional intentional misconduct prior to the inception of the Policy which gave him reason to believe a claim might be made against him. Although it is not necessary to the resolution of this motion, the Court may draw a negative inference from Sojcher's blanket assertion of his Fifth Amendment Privilege that he was aware of facts, omissions, or circumstances which a reasonable person would expect may give rise to a professional liability claim against him prior to June 7, 2005. *See* Overman Decl. at ¶ 8; *Cowans v. City of Boston*, No. 05-CV-11574-RGS, 2007 WL 28419, at *2 (Jan. 4, 2007). As noted above, however, Sojcher's admissions establish as a matter of law that he was aware of circumstances that could lead to a claim against him prior to submitting the Application to Continental. Moreover, Sojcher may not now selectively invoke the privilege by submitting evidence to rebut Continental's claims after previously asserting his Fifth Amendment privilege.

considering the nature of Sojcher's intentional misconduct. Nonetheless, it bears noting that Sojcher's subjective belief about whether a claim might be made against him is irrelevant under the controlling objective standard. As this Court put it: "The issue here is what a reasonable attorney in [the insured's] position would have been expected to know when answering the question that [the carrier] posed. It would be a worse public policy to construe the test in a way that gave special protection to the most stupid or amoral of attorneys whose ignorance or indifference would allow a 'no' answer to be given with a clear mind and a clear conscience." *Volterra,* Civil Action No. 96-10885-RGS at 2 n.1. *See also Brownstein & Washko v. Westport Ins. Co.*, 2002 WL 1745910 (E.D. Pa. July 24, 2002) (internal cites omitted). The only question is whether a reasonable attorney in possession of the facts known to Sojcher would expect that a claim might be made. Under this standard, Sojcher's "no" answer to Question 3 was patently false.

### 2. <u>Sojcher's Misrepresentations Were Material to Continental's Acceptance of the Risk</u>

Under Massachusetts law, a fact is deemed material if the knowledge of it would have naturally influenced "the judgment of the underwriter in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of the premium." *Keegan v. Mt. Vernon Fire Ins. Co.*, No. 1451, 2002 WL 31731474 (Mass. App. Div. Dec. 2, 2002) (internal cites omitted); *Shapiro,* 584 F. Supp. at 1249 ("If an insured falsely states facts that heighten the risk being insured against, the misrepresentation is material"); *Hanover Ins. Co. v. Leeds*, 674 N.E. 2d 1091, 1094 (Mass. App. Ct. 1997) (internal citations omitted). Like many other jurisdictions, Massachusetts courts may interpret materiality as a matter of law when the facts are not is dispute. *Shapiro*, 584 F. Supp. at 1249-50; *Leeds*, 674, N.E. 2d at 1094; *Graham & Schewe*, 339 F. Supp. 2d at 727.

Lucy Aiello, the underwriter for Continental who reviewed Sojcher's Application, has submitted a declaration which accompanies this motion. In her declaration, Ms. Aiello confirms that Continental would not have issued the Policy had it known the truth about any of Sojcher's misconduct detailed in this motion. Declaration of Lucy Aiello, filed concurrently with Continental's motion, at ¶¶ 8-9 Courts have widely held that such statements by underwriters are sufficient to prove materiality, and Massachusetts law is in accord. *Graham & Schewe*, 339 F. Supp. 2d at 727; *Gionfriddo*, 524 F. Supp. 2d at 176; *Blacker*, 767 N.E. 2d at 601. Indeed, in egregious circumstances such as this one, misrepresentations may held to be material as a matter of law, without an affidavit from the underwriter. *See Gionfriddo*, 524 F. Supp. 2d at 177 (when the insured admits to intentional misconduct prior to the application, the only reasonable conclusion is knowledge of numerous potential claims would have "substantially influenced an insurer's decision"); *Graham & Schewe*, 339 F. Supp. 2d at 728 (accurate information about an applicant's exposure to potential claims is so fundamental to claims made-underwriting, a significant misrepresentation may be said to increase the risk of loss as a matter of law without proof of subjective reliance by insured). Accordingly, Sojcher misrepresented a material matter on his Application, and Continental is entitled to rescind the Policy as a matter of law.

**B. <u>Sojcher's Bad Faith Claims Should Be Dismissed</u>**

Sojcher's bad faith counterclaims could not be more meritless. Notwithstanding its clear-cut grounds to rescind the Policy, as well as multiple other serious coverage issues, Continental has provided a defense for Sojcher, through independent counsel of his choice. Overman Decl. at ¶ 2. When asked in interrogatories and document requests to disclose the basis for his counterclaims, Sojcher asserted his Fifth Amendment Privilege. SOMF at ¶ 19; 78-79. Sojcher has refused efforts to take his deposition, and represented through counsel that he will assert his Fifth Amendment Privilege in response to all deposition questions. Overman Decl. at ¶¶ 3-8.

Certainly, Sojcher may not pursue an affirmative claim against Continental, while at the same time refusing, on Fifth Amendment Privilege grounds, to disclose the basis for those claims. There simply is no basis for Sojcher's bad faith claims, which should be dismissed with prejudice.

## IV. CONCLUSION

Sojcher's admissions establish beyond doubt that he was aware of "facts, omissions or circumstances which a reasonable person would expect may give rise to a professional liability claim" when he submitted the Application for the Policy. His denial of that knowledge in response to Question 3 of the Application constitutes an egregious and inexcusable misrepresentation. Had Sojcher provided an accurate response to Question 3, Continental would not have issued the Policy. Consequently, Continental is entitled to rescind the Policy, and to a determination that the there is no coverage under the Policy for any claims made against Sojcher, including without limitation the claims made by First American and Chestnut Hill. In addition, Sojcher's groundless Counterclaim should be dismissed with prejudice.

Respectfully submitted,

December 12, 2008

By: /s/ Richard A. Simpson

Richard A. Simpson (admitted *pro hac vice*)
rsimpson@wileyrein.com
Kelly V. Overman (admitted *pro hac vice*)
koverman@wileyrein.com
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000 (phone)
(202) 719-7049 (fax)

Regina E. Roman
roman@srbc.com
William Boesch
boesch@srbc.com
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street
Boston, Massachusetts 02114-4737
(617) 227-3030 (phone)
(617) 523-4001 (fax)

*Counsel for Plaintiff Continental Casualty Company*

**CERTIFICATE OF SERVICE**

I hereby certify that this document is being filed through the ECF system, and that I am therefore relying on the system to complete service by sending copies of the filing electronically to the necessary counsel, who are registered participants.

/s/ William L. Boesch

SRBC410776.1