ISSUED BY THE UNITED STATES

BANKRUPTCY COURT,

DISTRICT OF MASSACHUSETTS

(Eastern Division)

- - - - - - - - - - - - - - - - - - - - -

IN RE: SHAMUS HOLDINGS, LLC.,

Debtor.

- - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF STUART H. SOJCHER, called as a witness by counsel for the Debtor, pursuant to the provisions of Massachusetts Rules of Civil Procedure, before Victoria S. Reade, Professional Court Reporter and Notary Public, in and for the Commonwealth of Massachusetts, taken at McCarter & English, 265 Franklin Street, Boston, Massachusetts, on Thursday, September 20, 2007, commencing at 10:00 a.m.

APPEARANCES

MCCARTER & ENGLISH
BY: Ms. Kara A. Lynch, Esq.
Mr. Charles Dale, Esq.
265 Franklin Street
Boston, Massachusetts 02110
617-607-9200
Counsel for the Debtor

REIMBER BRAUNSTEIN
BY: Ms. Alissa L. Poynor, Esq.
Three Center Plaza
Boston, Massachusetts 02108
617-523-9000
Counsel for LBM Financial, LLC

ROBINSON & COLE
BY: Ms. Danielle Andrews Long
One Boston Place
Boston, Massachusetts 02108
617-557-5934
Counsel for Charles Housman

# INDEX

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Stuart Sojcher | | | | |
| by Ms. Lynch | 4 | | 71 | |
| by Ms. Poynor | | 68 | | |

# EXHIBITS

| Exhibit No. | | Page |
|---|---|---|
| 1 | Subpoena | 4 |
| 2 | Note | 43 |

EXHIBITS ATTACHED TO ORIGINAL TRANSCRIPT

P R O C E E E D I N G S

(EXHIBIT NO. 1 WAS MARKED FOR IDENTIFICATION.)

STUART SOJCHER, having first been satisfactorily identified by the production of his driver's licence and duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION BY MS. LYNCH:

Q. Can you state your name for the record, sir.
A. Stuart, S-T-U-A-R-T, Sojcher, S-O-J-C-H-E-R.
Q. Okay. Mr. Sojcher, my name is Kara Lynch, and I'm going to be asking you, I believe, the bulk of the questions today. Have you ever been deposed before, sir?
A. Yes, I have.
Q. So you're familiar with the basic protocol for depositions?
A. Yes.
Q. Okay. I'll just remind -- I don't have to go through the same usual drill -- but I'll just remind you to make sure that I

finish my question before you begin to answer, and I will do the best to do the same so we don't interrupt each other and we have a clear transcript.
A. That's fine.
Q. Where do you live, sir?
A. At the moment I am separated, so I'm not really quite sure where I live at the moment.
Q. Okay. Well, where did you wake up --
A. Do you have a want a mailing address?
Q. Sure. I'd like --
A. [redacted]
Q. And how long have you had this mailing address?
A. For over six years.
Q. Is --
A. -- since the end of 1999.
Q. Is this where your wife resides or --
A. No. I would prefer to keep that out of the picture, please.
Q. Okay. Prior to 1999, where did you live?
A. I li[redacted]

Winchester.
Q. Okay. And how long did you live there?
A. Approximately two years.
Q. And prior to -- so that was 1997 to 1999?
A. Yes.
Q. And prior to 1997, where did you live?
A. 99 Pond Avenue, Unit 802, Brookline, Massachusetts.
Q. And how long did you live there?
A. I believe I lived there for approximately a year.
Q. So approximately 1996?
A. 1996 through 1997.
Q. Where were you born, sir?
A. Brooklyn, New York.
Q. And when did you move to Massachusetts?
A. I don't remember exactly, but I think I was probably around four or five.
Q. Do you have any intention to move from the [redacted] address in the next year?
A. Probably, yes.
Q. Do you know where you're going to be living?

A. My first reaction, I won't tell you. I have no idea truthfully.
Q. Are you going to keep the [redacted] Street address as a mailing address?
A. At the moment, yes. In the future, I don't know.
Q. Do you have an office location, sir?
A. There.
Q. Okay. And do you intend to move your office location as well?
A. At some point, probably, yes.
Q. You haven't -- have you entered into any sort of a purchase and sale agreement for a different property?
A. No.
Q. How about a lease agreement for a different property?
A. None.
Q. What is your Social Security number, sir?
A. Do I have to give that to you?
Q. You don't have to.
A. I would prefer not to.
Q. Okay. Did you graduate from high school?
A. Yes.

Q. When did you graduate from high school?
A. 1971.
Q. And what high school was it?
A. Leominster High School.
Q. Did you go to college?
A. Yes. University of Massachusetts in Amherst.
Q. Did you obtain a degree?
A. BA in film.
Q. What year?
A. 1975.
Q. Did you go on to any other education after college?
A. Graduate school, University of Maryland from 1975 through 1977. And I received a master's degree in communications.
Q. Any other graduate school?
A. Law school, Suffolk University, graduated in '81 -- 19.
Q. Days or nights?
A. Days.
Q. Do you, at this point, hold any federal or state certification or licenses?
A. No.

Q. When was the last time you held a license?
A. What kind of license?
Q. Your law license.
A. I was disbarred in July of this year.
Q. Other than your law license, have you held any sort of other state or federal license?
A. Real estate broker's license.
Q. And when did you get that?
A. I probably had it for years and I don't know if I ever really used it.
Q. Did you have to go through any sort of education to get the --
A. None.
Q. Did you take a test for the license?
A. No.
Q. How did you get it?
A. I believe that if you become a licensed, practicing attorney, you are automatically granted entrance into the real estate brokerage division and you are granted a license.
Q. So do you have any recollection or can you estimate when you applied for the license?

A. Twenty years ago maybe.
Q. And when did you -- when did the license lapse?
A. Probably it will be lapsing in October of this year. That's when the renewal date comes up.
Q. And why are you choosing to let it lapse?
A. I really don't care.
Q. Have you ever sold real estate?
A. No.
Q. Are you represented at all by counsel?
A. No.
Q. Did you prepare for today's deposition?
A. No.
Q. You didn't. Have you seen this before, sir?
A. Yes.
Q. And what is that?
A. It's a subpoena directed to me.
Q. And when was the first time you saw that?
A. I have no recollection.
Q. But recall receiving a copy of that?
A. Yes, I do.
Q. Along with the subpoena, is there a --

can you see that there is also a Schedule A --
A. Yes.
Q. -- and a Schedule B?
A. Yes.
Q. And am I correct they're documents requested along with the schedules?
A. Yes. My problem is that unfortunately I don't have access to some of the documents -- or I should say any of these documents at this time because I am under an execution with my landlord.
It's a wonderful story, isn't it? And I don't have proper access to the office, so I can't provide you with those documents.
I'm presently trying to negotiate something where I will be able to stay there and get those documents. And I don't have any problem getting anything you need --
Q. Okay.
A. -- once I regain access.
Q. Okay. So right now you're saying you have

been shut out --
A. Yes.
Q. And what location is that?
A. 229 Berkeley Street.
Q. And when was the last time you had access to 229 Berkeley Street?
A. About a week and a half ago.
Q. And why were you shut out of this residence?
A. Nonpayment of rent.
Q. And you said once you negotiate with your landlord, you'll be able to have access to the documents.
A. Right.
Q. Are you right now in negotiation?
A. Yes. I'm in negotiations with people who are in the process of hopefully taking over the back rent and bringing it current, so that I'll have access to the office again and all my files.
Q. And who were those two people?
A. Aaron Stephenson.
Q. Aaron Stephenson?
A. Aaron, Double A, R-O-N,

S-T-E-P-H-E-N-S-O-N. And Demetric Gilmore, D-E-M-E-T-R-I-C. Gilmore is spelled, G-I-L-M-O-R-E.
Q. Is Mr. Stephenson at all affiliated with Foundry Realty, LLC.
A. No, he's not.
Q. Is he affiliated with 655 Corporation?
A. No.
Q. LBM?
A. No.
Q. Wolfpen?
A. No.
Q. Pine Banks?
A. No.
Q. Is Demetric Gilmore associated at all with Foundry Realty?
A. None of those previous entities or people that you mentioned.
Q. And who was your landlord, sir?
A. Druker Company.
Q. What is it?
A. Druker, D-R-U-K-E-R.
Q. And do the documents that -- any documents that you have that our responsive --

strike that.

Any documents that you know of that would be responsive to these requests are contained in 229 Berkeley Street?

A. Yes. The only other place they could be would be the office of a Vincent James DiMento.

Mr. DiMento served as counsel to 655 Corporation in -- I don't know how recently or how long, but he may have some documents pertaining to this.

Q. Did Mr. DiMento serve as counsel to 655 Corporation --

A. Yes.

Q. -- in May of 2003?

A. No. But he was serving as counsel to 655 Corporation in 2005. And also to Mr. Laverty, who was then, I believe, the president of the corporation.

And I remember a request for all documents pertaining to the loans with LBM and Wolfpen as they pertain to 655 Corporation, so it's possible that he may have those files.

His phone number is 617-523-2345. He doesn't get in until after 12:00 and I recommend that you do call him.

Q. Okay. And did you -- when you received that request for all documents pertaining to loans between 655 Corporation --

A. I turned over everything to him. They were binders that were prepared by the closing attorneys, Burns and Levinson.

Now, it's possible that Burns and Levinson may also have files pertaining to the loan transaction involving -- actually, not possible.

It's probable that Burns and Levinson has those files. I don't recall of name of the attorney. There were two attorneys who were handling it, but I'm sure that with their resources, they could probably figure that out.

Q. Let me just quickly remind you -- let me just get my question out and then --

A. Sure.

Q. -- you can answer.

The two attorneys for Burns and Levinson, who were they representing at those -- at the closing?
A. They were representing General Bank. They were bank counsel. It was either General Bank or Cafe Bank. I am not sure what the bank was called at that time.
Q. And where were they representing General Bank?
A. Where.
Q. I think you said that they were at closings. I'm just trying a figure out what closing.
A. Closings involving 655 Corporation and 320 Corporation.
Q. And when you say, "Closings involving 655," what are you specifically referring to, what closing?
A. 655 Corporation was property located at 655 either East Second Street or West Second Street in South Boston, Massachusetts, and as part of the loan transaction, they took additional collateral on a number pieces of property,

including Foundry Realty, LLC.

Q. So when you're talking about the loan transaction, you're talking about the May 2003 loan transaction?

A. I don't know if it was May 2003, but it was 2003 or 2004. I'm not sure what date it was.

Q. And General Bank was present for that closing as well?

A. It was either General Bank or Cafe Bank. I'm not sure if Cafe Bank became General Bank or if it was vice versa.

Q. Okay. And then you said that there was another closing involving 320 Corporation?

A. Yes.

Q. And what closing was that?

A. That involved property at 320 West Third Street in South Boston. That was a construction loan for, I think, $5 million -- $,975,000.

Q. And how was Foundry involved in the 320 Corp closing?

A. I don't believe it was. I don't believe that they gave any additional collateral

with respect to that.
Q. Were you present for that closing?
A. Yes.
Q. Why were you present for that closing?
A. I was representing 320 Corporation at the time.
Q. Who were the principals of 320 Corporation?
A. Bernie Laverty and Barry Queen.
Q. And when was that closing?
A. I think it was in May or June of 2003 or 2004.
Q. Do you know if that closing, the 320 Corp closing, came before the 655 Corp closing or after?
A. I think 655 came first, but I don't quite remember. I'd have to see a closing binder.
But the closing binders with respect to both of those properties are with Mr. DiMento. He requested all of the binders and he received them all.
Q. And he requested the binders from you or from someone else?

A. From me.
Q. And why it that you kept the binders for both of those closings?
A. I was counsel to the corporation, so I just held onto them.
Q. Was 320 Corporation involved at all at the 655 closing?
A. No. They were two separate loan transactions.
Q. And you said that, going back, that Mr. DiMento also served as counsel to Mr. Laverty, was he personal counsel to Mr. Laverty?
A. I think so, but I don't know the relationship as far as whether he actually was personal counsel or not. I guess I assume he was.
Q. When was the last time that you spoke with Mr. DiMento?
A. Probably a year.
Q. And what was that in regards to?
A. I don't know. It could have been involving various matters involving Laverty and 655, 320, SOS Realty -- all

kinds of loan transactions and projects that Mr. Laverty and Mr. Queen and Frank Fraine were involved with.
Q. And SOS Realty is the name of another entity?
A. It's another entity that owns 51- -- I think they're in bankruptcy -- they own 5168 Washington Street in West Roxbury, not the site of the fire.
Q. And who were the principals of SOS Realty?
A. Laverty and Queen.
Q. And did Mr. DiMento also represent SOS Realty?
A. Not at that time, not at the time that they received financing from another institution.
Q. When did SOS receive financing from another institution?
A. 2005, I think. November of 2005, I think. Or maybe it was November of 2004. I'm not sure.
Q. And what do you -- were you present -- was the closing?
A. Yes.

Q. Were you present for the closing?
A. Yes.
Q. And why were you present to the closing?
A. Representing SOS Realty at the closing, served as their counsel.
Q. And who provided the loan to SOS Realty at that closing?
A. I think it was Framingham Cooperative Bank or Framingham Savings Bank. My memory is failing me. I don't know.
But I do know that Mr. Norris was present at the closing with Mr. Mallegni, and the president of the bank was there. I just don't remember. Sorry.
Q. That's okay. And why were Norris and Mallegni present for the closing?
A. Because they were, I think, taking back a mortgage on the property. There was a construction loan and they were involved with it.
They had a first mortgage originally and they were being paid off -- a portion of the proceeds were being used to pay them off and they were taking a

second mortgage on the property beyond the construction loan.

Q. Was there a guarantee for this Framingham Cooperative Bank loan on the SOS property?

A. Guarantee signed by whom?

Q. Anyone.

A. I believe that Laverty and Queen signed the guaranties and I'm not sure what the relationship was between the bank -- Larry Erickson, that's it. He was the principal.

I'm not sure what the relationship was with he and Mallegni, but I think it's possible that Mallegni may have signed some type of a corporate guaranty regarding this.

Q. Was there a guarantee for the 320 Corp closing?

A. Yes. It was signed by Laverty and Queen.

Q. And was there a mortgage put on the 320 property?

A. Yes.

Q. For how much? Was it the 4.97 million?

A. Yes, approximately $5 million.

Q. Do you have any -- strike that.
In the Berkeley Street location are there any organizational documents relating to the Foundry?
A. Yes, there probably are. They're also probably located an the Secretary of State website also.
Q. And what organizational documents are at the Berkeley Street location?
A. The original certificate of formation.
Q. And who prepared the original certificate of formation for the Foundry?
A. I did.
Q. And did you also sign it?
A. Yes.
Q. Are there any -- do you have at the Berkeley Street location any organizational documents for LBM?
A. No. I had nothing to do with forming LBM.
Q. How about 655 Corporation?
A. I never formed the corporation. I think that the person you may need to speak with would be Frank Kirby. I'm not sure, but I think he was the original president of 655

Corporation.
Q. Do you have any organizational documents for On Broadway?
A. No, because Mr. Kirby was involved with that.
Q. In what way was he involved with that?
A. He was the president.
Q. And what kind of entity is On Broadway?
A. It's a corporation, S corporation, that owns property 420 West Broadway in South Boston.
Q. And have you been affiliated in any way with On Broadway?
A. Outside of doing some legal work, no.
Q. And Frank Kirby you mentioned -- I'm sorry -- he was -- you believe he formed the 655 Corporation?
A. I believe he either formed it or he was involved in the original formation, because I believe he was also the original president.
Q. And do you know when Mr. Kirby ceased being president a 655 Corporation?
A. Some time in 2003, I think, or maybe 2004.

I don't know for certain.

Q. At the 655 closing or the May 2003 closing between 555 and LBM, was Mr. Kirby still the president of 655 Corporation?

A. There were two separate loan transactions. One was with Wolfpen or LBM. At that time, Kirby was the president. At the second loan transaction with General Bank, he was not the president.

Q. The Wolfpen loan transaction, when did that occur?

A. I thought that occurred in either 2002, in the winter of 2002, or in the winter of 2003. I don't have the exact dates.

Q. And, again, you were present for that transaction?

A. Yes.

Q. And what occurred at that transaction?

A. Wolfpen gave a loan to 655 Corporation, the proceeds of which were used to pay off various mortgagees and pay off the MBTA pension fund which held a first mortgage in the property.

Q. How much was the MBTA's pension fund

mortgage on the property?

A. Well, they had a $7 million -- a total of $7 million on three separate pieces of property, and I think they were paid off around a million five, a million six, something along those lines with regard to that closing.

Q. And when you're talking about they had a mortgage on the property, what property was that, the 655 Corporation property?

A. Yes. Yes. And there's additional collateral. LBM, I believe, took a position on On Broadway. That's the -- On Broadway Corporation, the 420 West Broadway property.

Q. Was that LBM or Wolfpen that took the position?

A. I think you'll have to check the settlement statement, but I think it was LBM.

Q. And they did that even though Wolfpen was the one that granted the loan to 655 Corporation?

A. Well, if it was Wolfpen, it would have

been Wolfpen. If it was LBM, it would have been LBM. That's all -- I just don't remember exactly what entity took it.

I just don't remember exactly which entity took it, but I know there was an entity that took another collateral position with respect to that loan.

Q. And when you say "another collateral position," are you talking about a mortgage?

A. Yes.

Q. Okay. But the loan was also from Wolfpen to 655 Corporation?

A. I don't remember. I honestly don't remember. My memory is failing me. If you can show me something, I can tell you, but I don't remember.

Q. Did you speak with Mr. Mallegni in preparation for today's deposition?

A. No.

Q. Did you speak to Mr. Kirby in preparation for today's deposition?

A. No.

Q. Did you speak to Mr. Norris in preparation

for today's deposition?
A. No.
Q. Did you speak with Mr. Fraine in preparation for today's deposition?
A. No.
Q. And who is Frank Fraine, sir?
A. Off the record?
Q. I'd prefer on.
A. One of the biggest pieces of shit on the planet. So that, you can keep that on the record.
Q. Okay.
A. Frank Fraine was the individual who basically was the, if you want to call it, the puppeteer behind everything that occurred with respect to 655 Corporation, 320 Corporation, On Broadway, and the Foundry.
Mr. Fraine could not have anything in his name and he basically called the shots with respect to the real estate empire that he was trying to build.
He held an office at the Foundry and he basically called the shots. And he

had around him at that office were Barry Queen, who you are deposing shortly, who should be able to shed a great deal of light on Mr. Fraine's functions on a day-to-day basis. You should just videotape me. And, let's see, Kirby had an office there.

Q. And this is at the Foundry?

A. Yes. It was just a den of thieves. You can quote me on that several times. I'm getting ready to tell my life story, so this is in preparation.

Q. That's fine. Did Bernie Laverty have an office there?

A. He did, yes, as did a fellow named Aidan Hughes who you won't find, is out of the country, and probably won't be allowed back in.

There was a guy named Pat Steriti(ph), and you should probably put him on your list of people you may want to depose, S-T-E-R-I-T-I. There's a fellow named Mr. Sharp, S-H-A-R-P, no E.

And there was an accountant who

was there named Jack Phillips and assorted hanger-ons -- or hangers-on.

Q. And who were those hangers-on?

A. Pieces of shit. God only knows.

MS. LYNCH: Let's take a break for a minute.

(THEREUPON, THERE WAS A SHORT RECESS.)

BY MS. LYNCH:

Q. Mr. Sojcher, how -- are you presently associated with the Foundry?

A. No.

Q. Okay. When was Foundry Realty, LLC, established?

A. In 2003 or 2004 it purchased the property. I acted as the manager. The attorney who I -- who was this guy -- Viola, that's it.

A guy name Viola owned the property or Haymarket Bank or Haymarket Financial, or one of those entities, and that's how it was purchased.

The attorney who handled the transactions was Miller -- I forget his -- Bruce Miller. Bruce Miller handled the

transaction.

Q. Was that for the Foundry or for Frank Viola?

A. For Frank Viola or one of his entities took back a mortgage. I, like an idiot, signed the mortgage and the note. And the Foundry was purchased, and that was the headquarters for the so-called Fraine empire.

Q. At what was the address of the Foundry property?

A. Unit C1 -- this is embarrassing. Was it 312 something?

Q. 314?

A. 312, dash, 314 something Street.

Q. West Second Street?

A. Okay. I mean, yes. I haven't reviewed any documents on the Foundry in a long time.

Q. And just to clarify that, that was in South Boston?

A. Yes. I don't care to remember any of this stuff actually.

Q. Who else was associated with the Foundry

at that time?
A. That's a very good question. Nobody -- everybody took credit for saying they found it or own it or whatever, but Fraine, if you want to call it that, for lack of a better term, was calling the shots on it.
Q. Frank Fraine?
A. Right. And everybody, all the corporations, had their offices there. That's where they ran -- they ran their operations out of that office complex space.
Q. And when you say all the corporations, which specific corporations --
A. On Broadway, 65- --
Q. Wait a minute. Wait a minute.
A. Sorry, sorry.
Q. When you say "all the corporations," what specific corporations are you referring to?
A. Foundry, 320 Corporation, 655 Corporation, On Broadway. There was a corporation called Platinum something that I created.

I don't even remember the name.

That was like a holding company or a money through which -- a company through which all the money went through and was distributed. And there was a construction company called City Scapes.

And I'm sure a number of other corporations whose name I just don't remember.

Q. And were all these corporations run by Frank Fraine?

A. No. He was never noted or denoted as an officer, director, stockholder. He had people basically acting as straws for him.

Q. And why was that?

A. He couldn't have anything in his name because he was a convicted or unconvicted felon from 1970s involving some electrical, he was an electrical inspector in the City of Boston.

I think he gave the state evidence against some people, and then he had problems with the -- he was in the newspapers a lot because of his

relationship with a guy named Jack Gallahue who was the chairman or the president of the MBTA pension fund, who he was able to get loans from in order to purchase property in South Boston.

Q. Did Mr. Fraine get loans from Jack Gallahue to purchase the Foundry property in South --

A. No.

Q. Do you know what properties Fraine got loans from, or for Gallahue to purchase?

A. He got loans to purchase On Broadway, I think, 320 and 655.

Q. Was this particular Gallahue involved in any of these corporations?

A. No.

Q. Other than Frank Fraine, who else -- you said there were several other people that were affiliated with the Foundry? Barry Queen?

A. Barry Queen really had nothing to do with the Foundry outside of the fact that he was there.

Q. Frank Kirby?

A. He had nothing to do with it either.
Q. Bernie Laverty?
A. Bernie Laverty benefited from the Foundry in that when -- he received money from the loan proceeds, from the Pine Banks loan.
Q. Did he personally receive money?
A. Yes.
Q. How much money did he receive from the Pine Banks loan?
A. I think $100,000.
Q. And was that money sort of off the books?
A. No. It was in a check.
Q. In a check from Pine Banks?
A. Checking account came from Steve's account. It was deposited into a Foundry Realty account at Citizens Bank and the money can be traced from Citizens Bank as to where it went. It's like I'm deposing myself.
Q. Aiden Hughes, what was his association with the Foundry?
A. Aiden Hughes was Frank Fraine's surrogate son. He supposedly did construction and got drunk at night all the time. I don't