really know what he -- he had a relationship with Viola.

I truly don't know what his function was other than Frank Fraine's drinking -- not drinking. Surrogate son.

Q. Okay. Was Viola affiliated with --

A. No.

Q. Not with the Foundry?

A. Other than giving the financing, he had no ownership interest, although he may have owned other units in the building.

Q. What about Pat Steriti, what was his affiliation with the Foundry?

A. I don't think he had any outside of just occupying space there.

Q. Richard Sharp?

A. Occupying space there.

Q. And Jack Phillips was the accountant?

A. He was the accountant and he was occupying space there. Everybody was occupying space there.

Q. Okay. What sort of business did the Foundry do once it was --

A. The Foundry was supposed to have been a

real estate company with the purpose of developing the property on Unit C1, which it owned.
Q. How about 655 Corporation, who owned that?
A. Laverty and Queen.
Q. Did Fraine have an ownership interest in 655 Corporation?
A. He had an ownership interest in everything. It just wasn't defined.
Q. And you indicated that Frank called the shots at the Foundry, did he call the shots at 655 Corporation?
A. He called the shots on everything.
Q. What was Laverty's ownership interest in 655?
A. I think he owned at least 65 percent, because he was the lead borrower on the loan.
Q. What about Queen?
A. Maybe 30, 35 percent.
Q. And what was the purpose of 655 Corporation?
A. To develop 18 condominium units at the location of the property, 655 West Second

or Third Street.
Q. Did that happen?
A. No. They took the money and bought cars, traveled, houses, go -- no. They never finished the project.
Q. Who did they take the money from?
A. General Bank.
Q. And was that --
A. The story gets better and better, doesn't it?
Q. And was that in association with the May 11, 2003, loan to 655 Corporation?
A. Yes.
Q. Who was Wolfpen, what sort of company is Wolfpen?
A. Wolfpen, I believe, was just one of Mallegni's financing arms to conduct real estate loans. That's all I know about it.
Q. And aside from Mallegni -- that's Marcello Mallegni?
A. Marcello, yes.
Q. Aside from Mr. Mallegni, who else was associated with Wolfpen?
A. Have no idea.

Q. Do you know if Mr. Norris was associated with Wolfpen or not?
A. I believe that he has an interest that Mallegni does whether it's in writing or not. Speaks for itself.
Q. And how about LBM Financial?
A. I believe he had an interest in LBM also.
Q. And who else was associated with LBM Financial?
A. Outside of the two of them?
Q. Yes.
A. I have no idea.
Q. And when you say "the two of them," you mean Mallegni and Norris, right?
A. Yeah. There's a possibility -- this is all speculation -- that there was a banker out a Worcester who owned Commerce Bank, Duddy Mousad. I think he may have had some type of interest in both of these entities.
Q. And his last name was Mousad?
A. Mousad.
Q. Mousad. Okay.
A. Mousad -- I don't know how he spells his

name, but I'm sure you can find it. He's the president of Commerce Bank, that shouldn't be too hard.

Q. And there was speculation that he had an ownership interest in Wolfpen --

A. I'm speculating, because of the close relationship between Mousad and Mallegni. And I believe that Mallegni had a line of credit from Mousad's bank.

Q. If Mallegni had a line of credit from Mousad's bank, which is Commerce, how come Commerce didn't provide the loan or the funding?

A. Because they couldn't charge the same exorbitant interest rates that Mallegni could.

Q. Was Frank Fraine also affiliated with Wolfpen?

A. No.

Q. How about LBM?

A. No.

Q. What was -- do you know what LBM's function was or the purpose of that company, what kind of work they did?

A. They just made loans as far as I know.

Q. How many mortgages were there on the Foundry property in May of 2003?

A. One.

Q. And what mortgage was that?

A. That was a mortgage to an entity controlled by Viola. I think it was Haymarket -- not Haymarket Bank, it was just some -- Haymarket Financial Advisors, something along those lines.

Q. What about a company by the name of Faneuil Investors Group?

A. That could be it also. Faneuil Investors Group was tied in with all of them -- Viola and his brother and a few other people.

Q. And do you recall when that mortgage was taken out against the --

A. It was taken out when the property was first purchased. I thought it was purchased in the summer of 2003 or the summer -- I think it was purchased in the summer of '03. I have nothing in front of me to tell me, so I don't know.

Q. If I represented that it was -- documents show that it was purchased in May of 2002, would that refresh your recollection?
A. That may be it. I didn't realize it was that early.
Q. But that was the first mortgage that was taken on the Foundry property?
A. Yes.
Q. And do you recall approximately for how much that mortgage was taken?
A. 575-, 550- -- something along those lines.
Q. $550,000?
A. Yeah. 550-, 575-.
Q. And in any event, that preceded any sort of LBM mortgage or secondary mortgages?
A. Yes.
Q. Okay. And what was the next? Was there another mortgage taken out on the Foundry property?
A. No, there was no mortgage taken out until Steve Ross -- no. Wait a minute. Excuse me. No.
When the loan took place with 655 Corporation, there was additional

collateral, the Foundry was pledged as additional collateral to both General Bank for a second mortgage and LBM had a third mortgage on the property.

All of the mortgages from LBM followed all of the mortgages that General Bank put on other pieces of property.

So, in other words, they piggy-backed on whatever collateral was given by General Bank. Every single piece of property was a piggy back.

MS. LYNCH: I want to mark this as an exhibit.

(EXHIBIT NO. 2 WAS MARKED FOR IDENTIFICATION.)

Q. All right. This has been marked as Exhibit 2. If you could take a look at that.

Are you familiar with that group of documents? You can take as much time as you need.

A. No, I don't need to. Believe me.

Yeah, that was the loan that that they took with a respect to the

additional collateral.
Q. And who took the loan?
A. LBM.
Q. And what's in front of you, correct me if I'm wrong, is a collection of documents, the first one being a note; is that correct?
A. Yes.
Q. And who signed that note?
A. Gee, it must be Barry Queen who signed it.
Q. And the next collection, that's a guaranty, sir?
A. That's my signature.
Q. You signed the guarantee?
A. Yup.
Q. And the final one is a mortgage and security agreement, what was that for?
A. That was in order for LBM to place a mortgage on the property.
Q. And that was to place a mortgage on the Foundry property?
A. Right.
Q. And that was in connection with the guaranty for the 655 loan from LBM; is

that correct?
A. Yes, that's correct.
Q. Was there a loan closing in connection with the LBM loan to 655 Corporation?
A. Yes, there was.
Q. And when did that loan closing occur?
A. Probably on or around the same date.
Q. So that would be May 9, 2003?
A. Yes.
Q. And where was the closing held?
A. I believe it was held at Norris's office in Marlborough, and Laverty can confirm that.
Q. And who attended the closing?
A. Laverty, a guy named Bob Radley, Queen, myself, and I believe that was it.
Q. I think earlier you had mentioned -- did General Bank attend that closing or --
A. That was a separate closing.
Q. Okay. I misunderstood.
Who was Bob Radley?
A. Bob Radley was a colleague, associate, and borrower of Mallegni. And he introduced Fraine, the company, to Mallegni. And he

was involved with the loan and I believe that he was promised some type a interest in the property.

Q. He was promised interest in the 655 property?

A. Correct.

Q. Did Norris attend?

A. Norris was there, yes. Mallegni was not present.

Q. Were these documents exchanged at the closing or had they been done in advance?

A. They were done in advance. I don't even know if anybody ever saw them. Everybody just signed.

Q. Did you -- I notice here for your guaranty, it's your signature is there and there is another signature signed in the presence of. Do you --

A. That's Michael Norris.

Q. Michael Norris. Was the guaranty actually signed in Norris's presence?

A. Yes.

Q. And when was that guarantee signed, do you recall?

A. On or about May 9, 2003.
Q. Okay. But maybe just not at the closing?
A. I believe it was signed at the closing, but I -- I'm pretty sure it was. But then again, there were some loosey-goosey things that went on through the years and who knows.
Q. And did you see did Mr. Queen sign the note at the closing or was that separate?
A. I believe he sign it at the closing, although I don't remember exactly. But I assume he signed it.
Q. Did you participate in the preparation of these documents, the note and the guaranty and the mortgage?
A. No, I did not prepare these documents.
Q. Who prepared these documents?
A. Michael Norris.
Q. And did Michael Norris prepare them on behalf a LBM?
A. Yes.
Q. And was he was counsel for LBM?
A. Yes.
Q. Did he hold any other offices with LBM?

A. I don't know, but I have always speculated that he had an interest in LBM and anything that Mallegni did.
Q. Did you receive or review any other documents prior to the closing relating to this transaction?
A. I don't remember. I really don't remember. I remember getting documents from General Bank about, you know, we went over documents from their attorneys with respect to the loan, but with this, I'm sure we didn't. Everything was done with Norris last minute.
Q. The General Bank documents, were they with respect to this loan or was it that with respect to the Wolfpen loan?
A. This loan.
Q. And what documents did you receive from General Bank in connection with this loan?
A. Well, anything that was to be signed the day of the closing -- the note, mortgage security agreements, signing the grants, UCC financing statements, guaranty, loan agreement -- the standard documents you'd

see in connection with a commercial closing.
Q. Do you know if anybody from General Bank or LBM performed a title search on the property on or before the closing?
A. I performed a title search.
Q. Did LBM -- strike that.
Did you inform LBM or General Bank that there was a preexisting mortgage on the Foundry property?
A. Yes.
Q. Okay. So they knew that they were taking out a mortgage subject to the preexisting mortgage; is that right?
A. That's right.
Q. Did the -- strike that.
Do you know if there was actually ever a loan given from LBM to the Foundry -- strike that.
Do you know if there was ever a loan provided to 655 Corporation from LBM?
A. That's the million-dollar question. I don't know.
Q. Was there a $1.2 million loan made on or

about May 9, 2003, from LBM to 655 Corporation?
A. There was a loan, yes.
Q. Was it for $1.2 million?
A. Yes.
Q. And were the proceeds from that loan given to 655 Corporation from LBM?
A. No. No money changed hands, not a dime.
Q. Why was that then called a loan?
A. Do you have five minutes?
Q. Sure. We have all the time in the world.
A. I hope not.
There was a problem with this loan in that it was a question of the developer company, developer company, slash, borrower having sufficient equity and having enough in the deal.
And there was a question to -- as all banks do, I'm not trying to be condescending, they want to make sure that the borrower has something at risk.
Now, LBM, as you probably know, is paid something at this closing. And you've probably seen the settlement

statements, which are in the possession of De Mento.

But there was still another question that they wanted to see equity in the deal. The borrower, 655 Corporation, couldn't really show that outside of -- I don't know what they could show, quite frankly. I wasn't around, I didn't know.

What they wanted was for LBM to some how take back some money in a second position so that could be seen as some type of equity. And that's how they'd get around the idea that the borrower had put some cash into the deal.

And that was to satisfy underwriting and banking requirements and probably FDIC requirements. They wanted to do this deal, for whatever reason, very badly.

And there was a negotiation at the offices of Burns and Levinson, I remember. Present at that time meeting were Laverty, myself, Queen and two attorneys from Burns and Levinson. Leslie

-- that's it. Leslie Moldowney was the attorney at Burns and Levinson. She was the lead attorney.

And we were trying to figure out a way to do it. I think they want back -- I had nothing to do with it. I think Queen and Laverty and reported to Fraine, they had a meeting somehow with Mallegni and they were able to structure this whatever you want to call it. You can call it -- I don't know how you call it.

I mean, if you look at it, it looks like a purchased money mortgage, but it wasn't a purchased money mortgage. But no money changed hands. They only money that changed hand was money that LBM used to record documents.

They paid themselves fees on the loan. They charged 16 percent interest, so they probably charged -- their usual practice was to charge 4 points. Norris charged an exorbitant legal fee, like twenty grand.

And that's what they did. So

you take a million -- 4 points of a million twenty, it's not a bad day's work for already loaning the money and then getting paid on the money again. But nobody thought of that yet.
So, no. No money changed hands. Was that five minutes or less?
Q. Who was actually involved in negotiating the loan from General Bank?
A. Laverty and Queen. Probably more so Queen. Queen had a relationship -- excuse me -- with Mallegni, a very close relationship with Mallegni from years ago.
I believe that their spouses, respective spouses, were friendly. So he had an in, if you want to call it that, with Mallegni and he was able to speak with him and help out in terms of trying to get thing to go their way or make requests.
Q. And who was the contact with General Bank?
A. It was a person there named Jeremy something. I'm not sure. Jeremy Chang.
Q. Jeremy Liu?

A. Jeremy Liu, L-I-U. And there was another person who was also -- and then there was a woman who they had a close relationship with.

She signed the subordination agreement with respect to the Foundry. And if you see her name, she was an important person in the process, very important. She was a senior vice president there.

Q. And when you say "she signed the subordination agreement with respect to the Foundry," was that at the time of the Pine Banks mortgage and the Foundry property?

A. Yes. Yes. She signed that. You will see her name on the document and she knows a lot about the 655 loan.

MS. LYNCH: Let's take a two-minute break.

(THEREUPON, THERE WAS A SHORT RECESS.)

BY MS. LYNCH:

Q. Mr. Sojcher, I just want to briefly

revisit the Exhibit 2 and the documents contained therein.

With respect to the promissory note that has been marked as Exhibit 2 for the $1.2 million, is it your testimony that, in fact, it was not an advance from LBM to 655 Corporation for the $1.2 million as originally indicated in the promissory note?

A. No.

Q. I'm sorry, sir. It's not your testimony?

A. No.

Q. There was not --

A. There was no advance made by LBM with respect to the promissory note for $1.2 million.

Q. Okay. And your testimony is that the alleged loan that was set up and was reflected in the note and the guarantee was actually done to create the appearance that there was equity in the 655 Corporation?

A. That's correct.

Q. And that was done specifically with the

purpose to induce General Bank to provide a later loan to 655 Corporation; is that correct?
A. Well, not a later loan, but that loan.
Q. I'm sorry. A different loan. Well, the 655 -- strike that.
The General Bank loan was a separate loan to 655 Corporation than the LBM loan to 655 Corporation, correct?
A. That's right.
Q. Okay. So the LBM to 655 Corporation or the alleged loan was purportedly set up and documented to induce General Bank to lend money to 655 Corporation; is that correct?
A. That's right.
Q. And it was on that basis that General Bank actually made the loan to 655 Corporation; is that correct?
A. That's absolutely correct. And in addition, the only -- excuse me. I have all this caffeine settling in my stomach. It's corroding enough as it is.
The only way -- this is

important -- that LBM would have been paid is if the loan went through, because nobody was about to do a loan. He had interest running at 16 percent.

You also had acceleration charges running at 32 percent. You should check to see whether or not LBM was registered under 27149 with the AG's office under the usury statute. So if LBM hadn't acceded and granted this purported sham of a loan, then they wouldn't have gotten paid off.

Q. By General Bank?

A. General Bank.

Q. And where -- is it your testimony that the proceeds from the General Bank loan went directly to LBM?

A. Excuse me. I don't know how much, but there were proceeds that went to LBM.

Q. And did some of the those proceeds go to LBM's principals or officers as well?

A. I don't know if a check was made payable to Norris, if it was made payable to LBM, or who it was made payable to, but they

did receive money from a closing.
If you check the settlement statement, you will see that they received money.
Q. And your testimony is that LBM would not have received that money had the sham loan from LBM to 655 Corporation been set up?
A. Yes.
Q. Mr. Sojcher, just turning briefly to the Pine Banks mortgage, you had talked about that briefly. Pine Banks had taken out a mortgage on the Foundry property; is that correct?
A. Yes.
Q. And do you know approximately when that Pine Banks mortgage was taken out on the Foundry property?
A. I think it was November of 2004.
Q. And how did that whole transaction come about?
A. Basically Haymarket Financial -- whatever their name was, wanted to be paid off. The loan was in default, payments hadn't been made, they were threatening

foreclosure, they didn't want to lose it and they had nowhere to go.

So I was trying to find a lender for that property and I approached Steve Ross about that. And that's basically the genesis of its beginning.

Q. And who was Steve Ross, sir?

A. Steve Ross is an attorney with Gilmartin, Fitzsimonds, et cetera, and he represents people who give loans did he also represent Pine Banks Mortgage --

A. Yes, he did.

Q. And you're saying Haymarket Financial, the documents indicated it was Faneuil Investors Group.

A. Okay.

Q. It was a first mortgager --

A. They were in first position.

Q. Yes. Okay. And whoever it was, whatever entity it was that was in first position was threatening to foreclose and that's the basis for your approach at Pine Banks?

A. That's correct.

Q. And did anyone perform a title search on

Pine Banks' behalf in connection with the loan?

A. I believe I did.

Q. And did you, in connection with that title search, did you inform Pine Banks that there were preexisting mortgages on the property?

A. Absolutely.

Q. And what mortgages did you inform Pine Bank existed on the property?

A. Faneuil Enterprises -- or I'm sorry. I seem to get the name wrong. General Bank and LBM. And there might have been, though I'm not certain, there might have been a condo lien on the property also, because a fair amount of condo fees were paid out of that closing.

Q. Okay. And in the order of position it was Faneuil Investors Group, slash, Haymarket that was first priority and then it was General Bank that had second priority?

A. Right.

Q. And then LBM had third?

A. Correct. And the condo association, if

they had a lien, were in fourth position.
Q. Did you speak with Mr. Ross or anybody at Pine Banks regarding a subordination of any of the mortgages?
A. Yes.
Q. And, first of all, let me back up for a second. What were the proceeds from the Pine Banks mortgage going to be used for or applied to?
A. The majority of it was going to be applied to paying off the first mortgage, which was in default and which was being accelerated and interest was accruing.
The other portion of the proceeds would be used to pay off the condo fees -- excuse me -- real estate taxes and the rest of it went wherever it went.
Q. And what conversations did you have with Steve Ross about subordination of the other mortgages?
A. Well, the conversations with Steve is that Steve would not do the loan unless he received a subordination agreement.

I mean, it's common sense. Why would he make a loan if he knew he wasn't going to be in first portion? And it's that simple.

We had conversations and I also brought Laverty into the picture because I really wasn't -- he had more of a relationship with Mallegni than I had. I had no relationship with Mallegni. I don't even recall speaking with him more than a few times, at that.

Q. So initially --

A. In addition, just to add color, Frank Fraine was in the Dominican Republic vacationing. And he didn't give a shit as to what was going on. He just said, "Take care of it."

Q. So you had the conversation with Steve Ross and Steve Ross was acting on behalf of Pine Banks and it was Pine Banks' position that they wouldn't grant a mortgage or take a mortgage on the Foundry property without the others --

A. Subordinating.

Q. That's right. And did Mr. Ross -- did you and Mr. Ross have a conversation with Mallegni or Norris, in fact for --
A. I think Mr. Ross and I had a conversation with Mr. Norris. I don't remember exactly, but I know that Laverty had a conversation with Mallegni and I think that he may have had a conversation with Steve Ross about that. I can't say exactly what Laverty did.
Q. Okay.
A. But I do know there was a conversation with Laverty and this woman who's a senior vice president of General Bank. And they acceded to the subordination.
Q. So General Bank granted a subordination to Pine Banks?
A. Right.
Q. Did LBM agree to subordinate --
A. Yes, they did.
Q. So LBM agreed to subordinate the mortgage to Pine Banks?
A. Right.
Q. And how was that done?

A. Well, the problem was, time was really of the essence. And Steve was very cooperative and he believed that they -- a subordination agreement was prepared. It was brought out by Laverty to Mallegni the day after the closing, because Ross had no reason not to trust either Mallegni or perhaps Norris.

Because I believe he had spoken with Norris or he had confirmation that Norris would get the agreements signed. Mallegni had agreed to sign.

Laverty had taken care of that and Laverty was going to Marlborough the next day to get the agreement.

I also had a phone call that afternoon sometime around 3 o'clock and that's when I remember the time with one of Mallegni's assistants saying that I need to get this subordination agreement signed, I need to know where Mallegni was and I wanted to make sure there wasn't a problem.

I was told that he would sign

the agreement, just that they didn't know when he would be available, but that he was aware of the agreement and that he would sign it.

Q. And, as you said, it was on that basis and on that reliance, Pine Banks' reliance on the representations of Mallegni and Norris, on behalf of LBM, that was the basis for Pine Banks granting the mortgage to the Foundry?

A. Correct. Nobody in their right mind would have made the loan with having the subordination agreements in place. That's absolute malpractice, negligence, gross negligence and complete insanity.

Q. And the General Bank's -- strike that.

Do you know why the subordination agreement was never signed by any of those principals?

A. You want the real answer?

Q. Yes.

A. Because Mallegni and Norris are assholes and liars. Sorry.

Q. Okay. Let me just take a few minutes, but

I think that's -- that's a good way to end. I'll just review my notes.
A. And, I would like to add for the record, I don't believe that they had any intention of signing after they promised to sign. Now, that's speculation.
Q. Just to recap for one minute. It's your belief that Norris and Mallegni promised Steve Ross and Pine Banks that --
A. Unequivocally. You can finish the question. I'm sorry.
Q. Sorry. That it's your belief that Mr. Norris and Mr. Mallegni on behalf LBM promised Steve Ross and Pine Banks that LBM would subordinate its mortgage to the Pine Banks mortgage for the purpose of inducing Pine Banks to grant a mortgage to the Foundry?
A. Right. They had asked whether or not General Bank was subordinating and they knew General Bank was subordinating.
Now, it's possible, I don't know, they may have even contacted someone from General Bank. I can't remember this

woman's name, but if you ask Laverty, he will tell you the name of that woman. And I'm sorry, I just don't remember her name. She signed the subordination.

I'd be shocked, or maybe surprised would be a better word, if someone from Norris's office didn't call and say are you signing this because that would be doing his due diligence with respect to this.

Q. And on that -- and based on those representations, once again, that's why Pine Banks granted the mortgage; is that correct?

A. Absolutely.

Q. And it's your belief that actually Norris and Mallegni did that, you know, said that they would subordinate to induce Pine Banks to grant the mortgage, but they actually never intended to subordinate?

A. I believe that they never intended to subordinate, because that was their practice in terms of not signing documents, not giving discharges. There's

a long history of that. And, of course, that's one person's opinion.

Q. But Pine Banks didn't have any reason to believe that at the time?

A. They had no reason and I don't believe -- and I shouldn't say anything more.

I don't believe they had had real dealings with Norris and Mallegni and they had not reason to believe that there was a pattern of fraud or deception.

Q. Okay. I'm just going to take a few minutes, but I think that's all I have for you, sir.

A. Okay.

MS. LYNCH: That's it. That's all I have.

MS. POYNOR: Do you mind if I ask you just a quick follow-up question?

MR. SOJCHER: No.

CROSS-EXAMINATION BY MS. POYNOR:

Q. I just want to make sure. Did Mr. Norris or Mr. Mallegni actually represent to you that they were subordinating, that LBM would subordinate?

A. Mr. Mallegni did not represent to me personally, but I believe Mr. Norris did, and he also represented to Mr. Laverty and he represented to Mr. Ross.
Q. When do you believe that Mr. Norris represented that to you?
A. Probably a day or two or three before the loan.
Q. Okay. And you said that an actual subordinate agreement was prepared?
A. Yes, it was.
Q. And Mr. Laverty took it to --
A. Mr. Laverty took it to Mr. Mallegni's office the following day. Mr. Mallegni either was unable or pretended he was unavailable and refused to sign it.
Q. He refused to sign it that day?
A. And, in addition, this subordination agreement came up several times over the next couple of years and he always refused to sign it.
He also indicated that he never granted his assent to a subordination agreement and Norris took that same

position.

Q. And you mentioned a phone call that you said you remember you made at 3 p.m. to --

A. I made a phone call at 3 p.m. I don't know why I remember that so precisely, because it was in the afternoon and I think I had to leave, I had to go somewhere.

Q. I'm just interested which day was that on.

A. It was on -- I will tell you. If I had a calendar -- I don't have one on me.

I think it was on a Wednesday or a Thursday because the loan closing took place and I remember -- I remember calling and I wanted to make certain that Mallegni would be available to track down an assistant.

I don't know if it was a man or a woman, because I know he has a marble -- a granite company and he has a number of people working for him. Tracked down this person, and this person said that Mallegni was available.

He was aware of the

subordination agreement, he was aware that the loan had to go through, he was aware he had to sign it and that they would get it to him for signature.

Q. And that was the day after the closing?

MS. LYNCH: Objection.

A. I think that was the day of the closing, it was the day of the closing.

Q. But it wasn't taken out to him until the next day?

MS. LYNCH: Objection. It's mischaracterizing his testimony.

A. I think it's possible it was faxed, but Laverty can probably confirm that.

MS. POYNOR: All right. Thank you.

THE WITNESS: That's fine.

REDIRECT EXAMINATION BY MS. LYNCH:

Q. I just want to ask a follow-up, Mr. Sojcher. When you had the conversation with Mallegni's secretary or assistant, it was clear that Mr. Mallegni knew that he was to sign the subordination agreement before the loan took place and the closing

took place in the Pine Banks mortgage; is that correct?
A. He knew that it had to be done simultaneously.
Q. Okay.
A. He knew. He knew.
Q. Okay.
A. He knew.
Q. And, as you indicated previously, he had given his assent and Mr. Norris had given the assent of LBM to Pine Banks prior to the closing; is that correct?
A. That's right.
MS. LYNCH: Thank you. I have nothing further.
(WHEREUPON, THE DEPOSITION WAS CONCLUDED AT 11:58 A.M.)